**In the Interest of William Paul ADKINS and Vincent Edward Adkins, Children,**

**George Lee Adkins, Appellant.**

**No. 64383.**

Supreme Court of Iowa.

Nov. 12, 1980.

Gene Commander of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., John G. Black, Special Asst. Atty. Gen., Francis C. Hoyt, Jr., Asst. Atty. Gen., and E. A. Westfall, Asst. Pottawattamie County Atty., Council Bluffs, for the State.

John W. Logan, Council Bluffs, for the children.

Considered by REYNOLDSON, C. J., and LeGRAND, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

Appellant George Lee Adkins appeals from a trial court decree terminating, under the provisions of sections 232.109–.116, The Code 1979, the parent–child relationship between him and his two sons, William Paul Adkins, born May 24, 1970, and Vincent Edward Adkins, born April 1, 1971. He asserts trial court improperly took judicial notice of a prior child in need of assistance (CHINA) case that deprived him of custody, and that the State failed to show the children could not be returned to his custody. We affirm.

The above children were born to George Lee Adkins and Nancy A. Adkins. Nancy abandoned the family shortly after Vincent was born and has not been heard from. She was a named party in the juvenile court proceeding and no appeal is made in her behalf. George obtained a dissolution and remarried. Commencing in 1972 the Department of Social Services became involved with George and his family in the areas of financial assistance, housing, and child care.

This record reflects the initial CHINA proceeding was commenced in 1977 after the third reported incident of George's violent abuse of the children. These incidents included a facial laceration, finger marks on Vincent's throat, and an episode with a knife. Several orders from that proceeding were offered and received without objection in this case.

By order dated September 28, 1977, the court found the children to be in need of assistance, "without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of their father and because of the faults or habits of their father and who are living under conditions injurious to their mental or physical health or welfare." The children were placed in the custody of the Department of Social Services. The court recommended foster care, but allowed the Department to place the children with George and their stepmother "so long as the Department . . . closely supervises the family." George Adkins was ordered to refrain from using any alcoholic beverages, to participate in counseling through the River Bluffs Mental Health Center and the River Bluffs Alcoholism Service Center, to take immediate steps to further his education,

and to develop vocational skills through agencies in the area, under the Department's supervision.

A March 28, 1978, order following review in the CHINA case evidenced the court's concern that the Department "closely supervise the family." Although the court found George had "complied or attempted to comply" with its prior order, the adequacy of the children's care was "uncertain" and the court directed the Department to intensify its supervisory efforts.

In a May 16, 1978, CHINA case order entered after hearing, the juvenile court found the Department in contempt of court for failing to follow its direction to closely monitor the family. The court further found the contempt was purged by the steps the Department took to prevent recurrence.

From June to mid–October 1978 George was incarcerated for assaulting his second wife, and he was on probation for the following year. The children were removed to foster care on June 29, 1978, and have been in various foster homes since that time. November 21, 1978, a review order in the CHINA proceeding denied custody to George's mother and stepfather because George had ready access to their home and due to the grandparents' "own poor 'track record' of bringing up their own kids."

In November and December 1978 following his incarceration, George lived with his mother and stepfather and was not employed. He was told he had to leave by January 1. He testified he was drunk about three or four times a week. December 28, 1978, he secured admittance to Clarinda Mental Health Institute where he had been a patient from July 15 to August 19, 1977.

At the institute George's condition was diagnosed as "inadequate personality," a behavior pattern characterized by ineffectual responses to emotional, social, intellectual, and physical demands. Such persons appear neither physically nor mentally deficient, but do manifest inadaptability, poor judgment, social instability, and lack of physical and emotional stability. As a secondary diagnosis, George was found to be paranoid. At the same time, tests indicated he was above average in formal intelligence.

George was given a drug to relieve symptoms of anxiety, nervousness and low frustration tolerance. A schedule of occupational therapy, individual therapy and vocational counseling was prescribed. Dr. Shah, a psychiatrist at the institute, testified he had hoped vocational rehabilitation for George would lead to some social rehabilitation. Although George was given part–time work in the institute cafeteria, "he needed continual reinforcement and some persuasion as regard to active rehabilitation programs .... And he did not do very well in the independent living skill part of it."

April 25, 1979, George went on a five–day leave and did not return until his probation officer insisted. George was able to effect his own release because of his voluntary patient status. About this time his marriage to his second wife was dissolved.

Dr. Shah testified this abandonment of the program "lost much of the gains we had made," and that George had not acquired independent living skills at the time he left the facility. His prognosis was that George would return to the state of affairs prior to his admission and there would not be any lasting improvement. It was Dr. Shah's opinion that while parenting was "one or two steps removed from what we were aiming for," he thought that if George had spent at least six months in vocational rehabilitation following his release, then stayed in one place at one daily job for another twelve months, he "would have [been] on the road to some kind of recovery."

Dr. Shah believed returning the children to George's custody would affect the children seriously, that they would "learn a lot of maladaptive ways of handling problems," and that it would change their perceptions and solutions they might find to their difficulties of daily living. He had concerns relating to harm that might come to the children as a result of George's inability to control his temper.

Following his stay at the institute, George went to Sheffield, Alabama, lived in a home with his grandmother, and drove a taxi part–time. At the September 13, 1979, hearing on this termination petition he testified his Alabama driver's license had been suspended because of an OMVUI conviction that occurred before he went to Clarinda. He testified he had obtained high–risk insurance and would get his license back.

Turning to the children, at the time this case was tried William was in his fifth foster home, Vincent in his third. George had seen them approximately three times after he got out of jail and before he went to Clarinda, and about seven times when on a weekend leave from that institution. After consultation with the River Bluffs Mental Health Center staff the Department set these up as "control visits," to be carried out on Saturdays in the home of George's mother and stepfather. George was not supposed to be alone with the children. After these visits the children were more rebellious in the foster homes and generally very hungry.

Department social worker Roxanne Gould testified she had charge of the Adkins case since November 1978, and was familiar with the case file. Several moves the boys have experienced were occasioned by William's inability to get along with Vincent, with the children in the neighborhood, and in the home. The brothers are now in separate homes. In August prior to this hearing and following a visit to the grandparents' home, William threatened other children and hit one with a baseball bat because he would not follow orders. Vincent told his foster parents he did not have to be there anymore and that he was not going to mind. The foster parents indicated they wanted the children moved if the situation continued. The visits were terminated pending hearing.

This social worker testified the children were nervous, anxious, and insecure. William is being counseled at River Bluffs. Usually the boys did not challenge the parent figure, but they caused problems among playmates "wanting to be first." They ex-hibited a general disrespect for society. It was her opinion the children should be stabilized in a permanent home and that the parent–child relationship should be terminated immediately.

In the process of this hearing the juvenile court judicially noticed the prior CHINA proceedings. George's counsel carefully preserved his objection to this step by motion in limine and again when the State requested such notice be taken.

By ruling filed December 3, 1979, the juvenile court terminated the parental rights of George and Nancy with respect to William and Vincent, and granted the custody and guardianship of these children to the Department.

Appealing, George asserts (1) the juvenile court should not have taken judicial notice of the CHINA action, that being "a separate and distinct proceeding," and (2) the State failed to meet its burden to show by clear and convincing evidence that the boys could not be returned to their father. The lawyer who was appointed guardian ad litem and attorney for the children has joined in the State's appeal brief.

I. *Judicial notice of the CHINA proceeding.*

The issue whether the CHINA proceeding should have been judicially noticed must be viewed in light of various provisions of the new juvenile justice act, chapter 232, The Code 1979. There are two procedures provided in the Code for severing the parent–child relationship. One is found in chapter 600A, the other in division IV of the new act, section 232.109 and following. The nexus between a CHINA proceeding and a chapter 232 termination action is readily apparent. Section 232.109 provides in relevant part:

No such [chapter 232] termination shall be ordered except under the provisions of this chapter if the court has made an order concerning the child pursuant to the provisions of division III [CHINA action] of this chapter and the order is in force at the time a petition for termination is filed.

Subsection 600A.5(2) also limits termination proceedings to those provided in chapter 232 if a court has made a chapter 232 CHINA order that is still in force. Subsection two of section 232.110 (venue) states:

If a court has made an order concerning the child pursuant to the provisions of this chapter [232] and the order is still in force at the time the termination petition is filed, such court shall hear and adjudicate the case unless the court transfers the case.

This termination action was brought under the provisions of subsection 232.114(5), which permits the court to sever the parent–child relationship if it finds:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from his or her parents for placement pursuant to [CHINA] section 232.102 for at least twelve months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of his or her parents as provided in section 232.102.

If after a termination hearing the juvenile court does not sever the parent child relationship but finds upon clear and convincing evidence that the child is in need of assistance under the CHINA statutory provisions, the court may adjudicate the child to be in need of assistance as though a CHINA proceeding had taken place. § 232.115(4), The Code.

These related statutes reveal a legislative scheme to provide for termination in the same court in which the CHINA adjudication has taken place, as a logical resolution of a child's "limbo" CHINA status where clear and convincing evidence discloses the existence of those prerequisites itemized in subsection 232.114(5). In these circumstances must the evidence and proceedings in the underlying CHINA case be replayed in the same court in the termination proceeding?

■ It is true, of course, that ordinarily judicial notice may not be taken of court proceedings in related but wholly different cases. *See State v. Stergion*, 248 N.W.2d 911, 913–14 (Iowa 1976); *Hawkeye Security Insurance Co. v. Ford Motor Co.*, 174 N.W.2d 672, 685 (Iowa 1970).

However, in special circumstances exceptions to this rule have been formulated and applied. *See Harms v. Bennett*, 256 Iowa 1320, 1323, 130 N.W.2d 734, 736 (1964) (in habeas corpus action trial court may take judicial notice of its records in prior habeas corpus action); *Green v. State*, 528 S.W.2d 617, 618–19 (Ct.Crim.App.Texas 1975) (trial court in revocation proceeding took notice of evidence in underlying criminal case in same court); 29 Am.Jur.2d *Evidence* § 59 (1967). In every case we have found, courts adjudicating a termination action have taken judicial notice of the underlying prior proceeding involving the subject child or children. *In re Welfare of Clausen*, 289 N.W.2d 153, 156–57 (Minn.1980); *In re Interest of Norwood*, 203 Neb. 201, 204–05, 277 N.W.2d 709, 711 (1979); *see In re Adoption of K.*, 417 S.W.2d 702, 704–05 (Mo.Ct.App.1967) (appellate court reviewing adoption proceeding judicially noticed the record filed in a prior neglect case appeal). Although George attempts to distinguish *Clausen* and *Norwood* because of statutory and rule differences, we are persuaded the rationale of those cases should be adopted here. Under subsection 232.114(5), CHINA and termination proceedings are not separate and distinct actions, but are interdependent and interwoven. The CHINA action may be a prelude or first step to termination of the parent–child relationship. *See In re Marriage of Carrico*, 284 N.W.2d 251, 255 (Iowa 1979); *In re Marriage of Snyder*, 276 N.W.2d 402, 406 (Iowa 1979); *In Interest of Hewitt*, 272 N.W.2d 852, 857 (Iowa 1978). Many of our decisions disclose that a termination action often follows directly from a prior CHINA adjudication. *See, e. g., In Interest of Kelley*, 262 N.W.2d 781, 782–84 (Iowa 1978); *Long v. Long*, 255 N.W.2d 140, 142–43 (Iowa 1977).

■ We hold it is permissible for a trial court in a subsection 232.114(5) termination proceeding to judicially notice the prior

CHINA case, including the evidence, providing certain safeguards are followed. Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling in the termination proceeding should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible.

█ The above steps were not taken in this proceeding. The State has selected certain reports from the CHINA case for inclusion in the appendix. We do not know whether the juvenile court took them into consideration.

Although the above procedure was not followed in this instance, we find no reversible error. Our review is de novo, see In Interest of Voeltz, 271 N.W.2d 719, 722 (Iowa 1978), and we arrive at the same result as did the juvenile court, without resort to the CHINA proceedings other than the orders offered into evidence by George.

II. *Sufficiency of evidence.*

█ It is conceded William and Vincent have been adjudicated children in need of assistance. § 232.114(5)(a). It is also conceded their custody has been transferred from George "for placement pursuant to section 232.102 for at least twelve months." § 232.114(5)(b). The fighting issue is whether this record discloses "clear and convincing evidence that the child[ren] cannot be returned to the custody of [their parent] as provided in section 232.102." § 232.114(5)(c). Subsection 232.102(6) provides that a CHINA placement of the child apart from its parents "should be terminated and the child returned to his or her home if the court finds by a preponderance of the evidence that the child will not suffer harm in the manner specified in section 232.2, subsection 5."

We need not be concerned with the interesting burden of proof problem created by these statutes. We find there is clear and convincing evidence that there has been no palpable change from the conditions that led to the CHINA action, and that the children would suffer abuse and harm if returned to George's care and custody.

The facts set out at the beginning of this opinion are well supported by evidence in this proceeding. Although George did obtain a G.E.D. certificate from Iowa Western Community College while in the Clarinda institution, he has not changed his lifestyle. He has consistently lived with relatives, in jail and in the institution since June of 1978. He has evidenced little actual interest in his sons by way of inquiries concerning their welfare. He made little attempt to secure employment where he could be near them.

His hearing testimony was evasive and inconsistent. He has no home to receive the boys. While asserting he was earning $50 to $60 per week, he claimed he could earn more if he worked harder. He said he was not working harder because he didn't need the money. Although he called the social worker "about court dates and stuff" he made no inquiry about the boys. George has not stopped drinking; he asserts he now can control it. He has refused to accept counseling and vocational rehabilitation assistance. Trial court was justified in finding George "has not demonstrated that he can live independently, nor that he has the stability to parent two young, demanding boys." We are not reassured by the fact George has not displayed violence since his assault on his second wife. After that incident he has been in sheltered environments and relieved from the tensions children bring.

What we wrote in *Voeltz*, 271 N.W.2d at 724, applies here:

In describing Connie we do not speak in a spirit of criticism, but with a sense of sadness. We appear to be dealing with an inadequate person and we must state the facts as we find them. Michael, Teresa and Patrick cannot continue in their parentless limbo. Child custody should be quickly fixed and little disturbed. *In Interest of Kester*, 228

N.W.2d. 107, 110 (Iowa [1975]). These children have been living in foster homes for over three years; the longer they remain in foster care the more difficult a suitable adoption becomes. *In re McDonald*, 201 N.W.2d 447, 453 (Iowa [1972]).

William and Vincent cannot wait out their formative years for George, age 35, to attain the maturity and stability to provide them proper parenting. *See In Interest of Kelley*, 262 N.W.2d at 786. Notwithstanding his interests as a father, the best interests of these children mandate a severance of their father's parental rights. We therefore affirm trial court's decision.

AFFIRMED.