IN RE INTEREST OF D.
STATE OF NEBRASKA, APPELLEE, V.
D.D.M., APPELLANT.

308 N.W.2d 729

Filed July 24, 1981. No. 43505.

James P. Miller for appellant.

Donald L. Knowles, Douglas County Attorney, and Christopher E. Kelly for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

This is an appeal from an order entered by the separate juvenile court of Douglas County, Nebraska, on March 21, 1980, terminating the parental rights of a mother to her four minor children. In an effort to minimize the notoriety a case of this type may bring to a family, we shall refer to the mother herein simply as "mother" and to the four minor children collectively as "the children." The trial court's order recites that by clear and convincing evidence the mother has failed to meet the requirements of Neb. Rev. Stat. § 43-209 (6)

(Reissue 1978) in that she has failed to correct the conditions leading to the previous determination that the minor children were homeless or destitute or without proper supervision through no fault of the mother, as defined in Neb. Rev. Stat. § 43-202(1) (Reissue 1978). We have reviewed the record de novo as we are required to do in cases of this nature. See, *State v. Worrell*, 198 Neb. 507, 253 N.W.2d 843 (1977); *State v. Kinkner*, 191 Neb. 367, 216 N.W.2d 165 (1974). Our examination of the record leads us to the conclusion that the evidence is not clear and convincing as found by the separate juvenile court, and the order of the separate juvenile court terminating the parental rights of the mother must be reversed.

The instant case presents the conflict which constantly arises between two competing theories. On the one hand, we are confronted with a desire to recognize and protect the integrity of the family unit. On the other hand, we are required and desire to take such action which will be in the best interests of the children involved. Finding that point at which one of those basic theories outweighs the other is a difficult task and one which the most dedicated of courts is not easily able to do.

Undoubtedly, it would be extremely helpful if this court could articulate specific standards and criteria by which determinations are to be made by the juvenile courts to whom these matters are presented. Unfortunately for all, however, such standards are not easy to articulate and it becomes apparent, after just a little experience with the subject, that indeed each case must be decided upon its own facts viewed in light of its own circumstances. The clear situations are never a serious problem for the court. It is those gray areas which pose the serious problem. As for those, we cannot do more than examine the matters on a case-by-case basis. We must, however, keep in mind our recent pronouncement made in the case of *In re Interest of Hill*, 207 Neb. 233, 239, 298 N.W.2d 143, 146 (1980), wherein

we stated that rules governing termination of parental rights "are intended to recognize the integrity of the family and to bring about parental termination only when that appears to be required and no other reasonable alternative exists." See, also, *In re Interest of Holley, ante* p. 437, 308 N.W.2d 341 (1981).

Further, in *State v. Worrell, supra* at 512, 253 N.W.2d at 847, we said: "[T]he rule has been long established in this state that courts may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. [Citations omitted.] Courts cannot deprive a parent of the custody of a child merely because the parent has limited resources or financial problems, or is not socially acceptable, nor because the parent's life style is different or unusual. Neither can a court deprive a parent of the custody of a child merely because the court reasonably believes that some other person could better provide for the child."

The record in this case upon which the court determined that the evidence was clear and convincing consists principally of letters written to the court by various welfare agents. While the exhibits were received without objection and therefore are properly before the court, there was no opportunity or effort made to cross-examine the authors of the various reports to determine the basis for their conclusions. In addition to the reports, the balance of the record consists principally of colloquies between the court and various state agents as well as the sworn testimony of only the mother. With regard to the state of the record, the court notes that in cases of this nature where the record must establish the justification for the action by clear and convincing evidence, observance of more formal court procedures is to be encouraged. See Neb. Rev. Stat. § 43-206.03(2) (Reissue 1978). In the instant case this court is called upon to examine the record de novo and to make its own findings of fact; and yet it must, to a

large extent, rely upon statements which, if formally offered in evidence and objected to, may be inadmissible. The terminating of parental rights is far too important a matter to be done by informal procedures.

The record discloses that the mother is a 33-year-old divorcee with four children now ranging in age from 4 to 11 years old. The record discloses that her former husband, a Vietnam veteran, was suffering from psychiatric difficulty and having difficulty adjusting to civilian life after being in Vietnam. Frequently he would become violent and physically abuse her. The record further discloses that she was raised in a rural setting where the showing of affection by members of the family was not only frowned upon but prohibited by her father.

In January of 1978, recognizing that she was in need of psychiatric care, the mother voluntarily placed her children with the State Department of Welfare and admitted herself into the Nebraska Psychiatric Institute in hopes that by doing so she might rearrange her life and be able to handle the needs of her children. The record is clear that had the mother not voluntarily sought psychiatric care and voluntarily brought her children to the state, it is not likely that either the state or the separate juvenile court ever would have been made aware of any difficulty or acquired jurisdiction over the children. In March of 1978 a dependency petition was filed, and the children were legally detained by the Douglas County Juvenile Court on April 5, 1978. Between April 5, 1978, and March 21, 1980, the juvenile court retained jurisdiction of this matter, placing the children for a time in foster care, for a time with the mother, and then back again in foster care.

The record fails to disclose any substantial evidence of any physical or mental abuse by the mother toward her children. As a matter of fact, one of the reports filed by a state welfare agent is clearly to the contrary. A report filed December 13, 1978, recites in part: "[Mother] has

demonstrated an excellent ability in handling all of the children's temper tantrums on different occasions . . . .[Mother] also shows the children affection by hugging and kissing them."

While it is apparent from reading the record that the mother is not likely to ever be selected as "housekeeper of the year," it is likewise clear from the record that her lack of housekeeping ability did not establish by clear and convincing evidence that her parental rights should be terminated. Quite to the contrary, the record indicates that while the mother had poor housekeeping habits, she continued to improve when given direction by the various state agencies. Each report indicates a somewhat improved condition over the previous report. And yet the basis for terminating parental rights is that the mother failed to make reasonable efforts under the direction of the court to correct the conditions leading to the determination.

The record would indicate that the mother made significant efforts to improve. It was suggested by the court that she attend Parent Effectiveness Training, and she attended. It was suggested by the court that she seek psychological counseling, and she sought it. It was suggested by the court that she make efforts to learn to be a better housekeeper, and she made such efforts, although admittedly she did not achieve perfection with regard to housekeeping. An example of that is disclosed in a report filed May 23, 1979, by a service officer to the juvenile court. The report analyzed the court's order dated February 7, 1979, and reads in part as follows:

"1) *That the children's mother is allowed reasonable rights of visitation and she is to exercise such visitation rights on a regular basis.*

"[Mother] has maintained regular visitation with her children. Please see the report from Clare Burton, Douglas County Foster Care worker.

"2) *That [child], child herein, shall continue psychotherapy as arranged by Douglas County Social Services.*

"[Child] sees Dr. Chavez every two weeks. Please see the report from Clare Burton.

"3) *That the childrens' mother shall regularly participate in Parent Effectiveness Training Program.*

"Conversation with Del Roper, Director of the Parent Effectiveness Training Program, on May 1, 1979, revealed that [mother] has been participating in the program on a regular basis. She participates in the program with the Omaha Home for Boys Staff. She participates on Wednesday from 9:00 A.M. until 12:00 P.M. Mr. Roper indicated that [mother] participates in the class discussion and she shares her personal experiences with others in the group. Del indicated that he is pleased with [mother's] participation in that group. He indicated that he will send a report to the court.

"4) *That the childrens' mother shall maintain steady full time employment.*

"[Mother] was employed at Lutheran Old Peoples Home from February, 1979 until May, 1979. Her working hours were from 10:30 P.M. until 7:00 A.M. Conversations with [mother] during April, 1979, revealed that sometimes she worked fourteen days in a row without a day off. They were short of help. During May, 1979, [mother] quit her job there. She quit because they wouldn't give her day hours, but her employer did give a co-worker day hours.

"[Mother] started working for the Tupperware Company on May 18, 1979. Conversation with [mother] on June 7, 1979, revealed that [mother] is participating in Tupperwares' manager training once a week. It appears that [mother] would have to be involved in about twenty parties or two thousand dollars worth of tupperware a month to have an income of five hundred dollars for one month. [Mother] indicated that she will bring a statement from her Tupperware distributor.

"5) *That the childrens' mother shall continue regular basis counseling with Mrs. Berit Yank at the Burt Stree [sic] Mental Health Clinic at 20th and Burt, Omaha, Nebraska.*

"Conversation with Berit Yank on April 12, 1979, and May 30, 1979, revealed that [mother] attends counseling on a regular basis. Berit stated that [mother] has developed a trusting relationship with her. Berit indicated that she will send a report to the Court."

It is difficult to understand how it can be suggested from a reading of that report that the mother was not making reasonable efforts to correct the conditions as directed by the court. It is true that there are items contained in the various reports offered to the court which, if standing alone and unexplained, would tend to place the mother in a bad light. Yet there were explanations. While the explanations may not be sufficient to satisfy a member of this court that the mother was the epitome of a housekeeper, they were sufficient to indicate that the mother was not treating the children in such manner that their best interests required the termination of her parental rights. Each succeeding report indicated that while the house was "messy," it was cleaner than it had been on previous occasions. In a report from Child Protective Service to the court dated May 24, 1979, the state worker reported: "[Mother] has been cooperative with me whenever we have had any contact. She has willingly answered any questions I have asked her. [Mother] has attended all her counseling sessions with Berit Yank at the Burt St. Clinic and will soon be starting a third session of the P.E.T. classes with Del Roper."

On June 6, 1979, Clare Burton, foster care worker for the Douglas County Social Services, wrote to the court and said in part: "Over the past few months I feel that [mother] has gained more sensitivity and awareness in interacting with her children. I feel she is beginning to understand how to take time with them individually and talk with them about their concerns. She has shown interest by frequently initiating contact with me regarding the children's foster home and school progress. I feel that her individual therapy and parenting classes have aided in this awareness but feel it vitally im-

portant that she continue in these programs to help her relate with her children."

In a further report dated July 23, 1979, the county service officer reported to the court in part as follows: "A conversation with Berit Yank, therapist at the Burt Stree [sic] Clinic, on July 12, 1979, indicated that [mother] attends therapy on a regular basis, and is doing very well. She is becoming much more open and is beginning to look more deeply at her behavior and also the childrens'. Ms. Yank is presently working with [mother] in terms of keeping a schedule by which to clean her home. She feels that [mother] is ready to have the children on a full time basis. She indicated that she will send a report to the Court."

On July 25, 1979, the therapist did send a report to the court indicating that the mother was indeed doing extremely well. She concluded her report by saying: "We feel that [mother] should be given the opportunity to have her family back and to use the various agencies and organizations as resources rather than judges of her behavior."

On August 6, 1979, the children's guardian ad litem reported to the court about a visit which he made to the home. He concluded the report by saying, "On the whole, my impression was the house was cluttered not filthy. I would recommend that the children be returned and there be constant supervision until it is shown that [mother] can handle the situation. I based this on the fact that she appears to have made progress on a personal level; she has tried to comply with the Court's order; she is trying to keep the house clean; and the weekend visits will prove its [sic] disruptive [to] the children."

And then in February and March of 1980, while continued progress is reflected (though, to be sure, there are instances which many of us would find objectionable), the court terminates her parental rights.

The separate juvenile court seems to find fault with the fact that the mother, while having a gross income of

perhaps never in excess of $500 per month, has not saved any money. There is no evidence, however, to indicate that the money was foolishly spent or that anyone could save money on $500 a month. The court indicated its disapproval that the mother had failed to comply with the court's order which provided that no one was to be present in the home when the children were visiting except for the mother and social workers. It appears that the mother had married and her husband was present. The court criticizes the mother for having her husband present while the children are visiting. There is some indication in the record, developed by conversation rather than by sworn testimony, that perhaps the marriage may not be legally valid. Nevertheless, the trial court seems to totally disregard the fact that the mother attempted to establish a lawful home in which the children could live. We are completely unable to determine the legality or illegality of the marriage based upon the record in this case. We are able to ascertain, however, that the children are extremely fond of the husband and that there is no evidence that his presence was detrimental to their well-being.

An overall examination of the record leads us to the conclusion that there is not sufficient evidence to establish that the best interests of the children are served by terminating parental rights. Quite to the contrary, the evidence is that the children very much love their mother and love each other, and if they are, indeed, having difficulties, some are due to the fact that they are separated from their mother and from each other. While we are not here condoning filth and the lack of good housekeeping standards, we are not prepared to terminate parental rights solely on that basis. The North Dakota Supreme Court, in the case of *In re Kelber*, 51 N.D. 698, 200 N.W. 786 (1924), perhaps captured the problem as well as it can be captured when it wrote: "The parents may not be blessed with intelligence of the highest order, nor with a high degree of education or culture. The law, however, makes no

distinction between the genius and the common man, the educated and ignorant, the refined and the uncouth, the rich and the poor, insofar as the natural right to the custody of offspring is concerned. Every consideration of justice and humanity requires that family ties shall not be lightly sundered. . . . The home and the family, held together by the ties of natural, rather than adoptive, affection, is the last bulwark of American institutions. Poverty, lack of education, or of culture alone are never sufficient justification for severing the ties that bind families together. In this western country, on these western plains, many a home might have been broken where large families were raised by the pioneers in one room cabins of logs, or sod, had poverty, lack of education, or begrimed faces of children, playing on naked mother earth, been the only showing required."

We are convinced that the best interests of these children are not served by terminating parental rights, but quite to the contrary are best served by reestablishing parental rights. To that end, the order of the separate juvenile court terminating the parental rights is reversed and the rights of the mother to her four children reinstated with physical custody of the children restored to the mother, subject to continuing supervision by the appropriate state agency.

Our action in this case should not, however, be construed by anyone, including the mother, as being approval of her manner of caring for her children, but rather our belief that she should be given further opportunity to correct her ways.

Although the mother made sincere efforts to comply with the requirements established by the juvenile court, her compliance in many respects was not satisfactory. There is evidence of substantial neglect of the children in the past. For that reason, it is essential that her custody of the children be under the supervision of an appropriate agency. In the event the children do not

receive adequate care, further proceedings will be necessary.

REVERSED AND REMANDED.

CLINTON, J., participating on briefs.