IN RE INTEREST OF P.F., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. S.M., APPELLANT.

381 N.W.2d 921

Filed February 21, 1986.   No. 85-373.

Patrick W. Meyer and Timothy J. O'Brien of Westergren, Hauptman, O'Brien & Wolf, P.C., for appellant.

Donald L. Knowles, Douglas County Attorney, and Elizabeth G. Crnkovich, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

S.M. appeals from the April 19, 1985, order of the separate juvenile court of Douglas County, Nebraska, terminating her parental rights to her daughter, P.F. On appeal S.M. claims that (1) the evidence was insufficient as a matter of law to terminate her parental rights and that (2) the court erred in basing its decision to terminate on P.F.'s refusal to have any type of contact with the appellant.

An appeal from an order terminating parental rights is reviewed in this court de novo on the record. *In re Interest of V.B. and Z.B.*, 220 Neb. 369, 370 N.W.2d 119 (1985). Such an order must be supported by clear and convincing evidence and should be issued only as a last resort where no reasonable alternative exists. *In re Interest of V.B. and Z.B., supra.* Nevertheless, the primary consideration in such cases is the best interests of the child. *In re Interest of D.*, 218 Neb. 23, 352 N.W.2d 566 (1984).

P.F. was born to S.M. and D.F. on April 1, 1968. D.F., who was P.F.'s natural father, died in 1971. In February of 1980 S.M. voluntarily placed P.F. in foster care. P.F. had been in foster care previously, from December 1972 until April 1973, when S.M. had been charged with child abuse.

On May 16, 1980, a petition seeking termination of S.M.'s parental rights was filed in the separate juvenile court of Douglas County, Nebraska. The court took immediate custody of P.F. and ordered temporary foster care placement. P.F. remained in the home of A.R., with whom she had originally been voluntarily placed.

On November 5, 1980, at an adjudication hearing, P.F. was found to be a child under 18 years of age lacking proper care by reason of the fault or habits of her mother. Neb. Rev. Stat. § 43-202(2)(b) (Reissue 1978). Jurisdiction over the appellant was based on a finding that she fell within the meaning of Neb. Rev. Stat. § 43-209(2) (Reissue 1978).

Neb. Rev. Stat. § 43-247(3)(a) (Supp. 1985) and § 43-292(2) (Reissue 1984) now contain the provisions which formerly were found in §§ 43-202(2)(b) and 43-209(2), respectively. The relevant portions of the statutes have remained substantially unchanged during the pendency of this case.

The juvenile court found evidence adduced at the November 1980 hearing to be "shocking." P.F., then 12 years of age, testified that her mother, S.M., had subjected her to physical and verbal abuse, including the infliction of a broken rib; cuts on her chin and stomach with butcher knives; bites on her fingers; pokes from keys into her arms, legs, and head; and threats to kill her, cut her up, and throw her into the river. P.F. also testified that her mother was frequently drunk and had often involved her, P.F., in the nighttime theft of large plants from homes.

S.M.'s attorney stipulated to "the background of any abuse, verbal abuse or physical abuse," and S.M. admitted in open court to three counts of abuse alleged in the State's petition. Specifically, S.M. admitted:

A. On or about January, 1980, said child [P.F.] was physically abused by [S.M.], natural mother of said child, resulting in bruises, scratches and abrasions, with little or no provocation by said child.

B. Said child has been physically abused by [S.M.], natural mother of said child, resulting in bruises, scratches and abrasions, with little or no provocation by said child; several incidents required medical treatment.

. . . .

D. Said child has been verbally abused, on a regular basis, by [S.M.], natural mother of said child, to wit: Retard, bitch, etc.

P.F. testified that her voluntary foster placement followed an argument between S.M. and S.M.'s mother. According to P.F., S.M. picked P.F. up from a friend's home and blamed her for the argument. S.M. bit P.F.'s fingers and twisted her hands while driving P.F. home. S.M. also threatened to kill P.F. At home, P.F. was ordered to clear the car of snow with her bare hand. Sensing a beating, P.F. fled to her grandparents' home.

P.F. testified at this initial hearing that she feared her mother and did not wish to return to her, even if her mother was able to change for the better. She also testified that S.M. did not love her and that she, P.F., wished to stay with her foster parent, A.R., because she felt safe and comfortable there, unlike at home.

The juvenile court found specifically that the child refused to return to the care and custody of the natural mother "because of the physical and verbal abuse inflicted upon her" by the natural mother.

The county attorney recommended that the prayer for termination be taken under advisement. The court advised that it would do so solely for P.F.'s sake. At the conclusion of the hearing the court specifically advised S.M. that

> the evidence is beyond a doubt sufficient to terminate your parental rights. Because of [P.F.'s] age and I feel it is in her best interest at this time, at this point it's not going to do her a lot of good at this point to disregard what happened in her life. She'll have to come to grips with it. That will also, I suppose, give you the opportunity to demonstrate any rehabilitation at future hearings.

An order was entered directing that P.F. remain in foster care, that both P.F. and S.M. undergo psychiatric and psychological testing, and denying visitation unless requested by P.F.

On January 15, 1981, following a disposition hearing, the court ordered that both S.M. and P.F. undergo therapy. S.M. was to engage in joint therapy when and if Dr. Taylor, P.F.'s therapist, recommended it. The prayer for termination was again taken under advisement. A psychiatric evaluation received into evidence indicated that S.M. had a mixed personality disorder with limited awareness about her daughter's needs and that she expected love and caring from P.F. to make herself feel better.

Subsequent to this hearing, the court held case reviews every 6 months, up to and including December of 1983. Attempts at joint therapy had adverse effects upon P.F., and by as early as the November 1981 review hearing, Dr. Taylor recommended that S.M.'s parental rights be terminated to allow P.F. to progress in her own therapy. However, at the November 5, 1981, hearing the juvenile court, for reasons that we are unable to understand, found that termination of the natural mother's parental rights would not serve the child's "long-term best interests." The prayer for termination of the natural mother's parental rights was "dismissed from the petition." As we view the record, that part of the order was contrary to the evidence,

was erroneous, and failed to consider the best interests of the child.

The evidence was clear and convincing from the very beginning that there was little or no hope of returning custody of the child to the natural mother. As time went by, although the mother appeared to be cooperating by attending counseling and parenting sessions, it became increasingly clear that she had made no real progress toward understanding her problem.

The juvenile court seems to have been more concerned with the desires of the mother than with the best interests of the child. As Dr. Taylor stated in her report of May 1, 1984: "I question keeping this child in a Court situation to meet the mother's needs."

Visitation was never specifically ordered by the court, but there was some contact between mother and daughter following P.F.'s placement in A.R.'s home. According to P.F., these contacts were accompanied by more threats and physical abuse on the part of S.M. Following a telephone call in which S.M. again threatened to cut P.F. into pieces and put her into the river, P.F. refused to accept any more visits or calls from S.M. The record is not clear as to when this call occurred. The foster mother's testimony indicates the call occurred sometime in 1982.

By June of 1982 there was some evidence that S.M. had made progress in her therapy. Nevertheless, P.F. continued to refuse any contact with her mother.

Finally, on January 11, 1985, the State filed a motion for termination of S.M.'s parental rights. At a hearing on March 7, 1985, Dr. Taylor testified that P.F.'s feeling of lack of permanency in her long-term foster care placement had created problems for her both at home and at school. Dr. Taylor recommended either a termination or relinquishment of parental rights so that P.F. could be adopted by her foster parent, A.R., in whom P.F. had placed all of her trust and loyalty. Such action would allow P.F. a sense of identity, and to do otherwise, according to Dr. Taylor, would put P.F.'s emotional development at risk.

S.M.'s therapist, Dr. Dyer, testified that S.M.'s prognosis was good and that she had shown a great deal of progress in therapy.

However, on cross-examination, Dr. Dyer admitted that P.F.'s feelings about her mother were very important in determining a disposition in her best interests and that a lack of identity for P.F. could result in "further psychiatric difficulties, emotional difficulties, difficulties in relationships. It could lead to a lot of chaos."

P.F., who was then almost 17 years old, testified that she did not love or like S.M. and that under no circumstances would she visit S.M., even in the event that she, P.F., could not be adopted.

The juvenile court found by clear and convincing evidence that P.F. fell within the meaning of § 43-292(6). This section provides for termination of parental rights when it is found to be in the best interests of the juvenile and it is shown that "[f]ollowing a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination." P.F. had previously been adjudicated a juvenile lacking proper parental care by reason of the fault or habits of her parent within the meaning of § 43-202(2)(b) (Reissue 1978), which has been succeeded by § 43-247(3)(a) (Supp. 1985).

Specifically, the court found, as alleged, that P.F. had been in foster care since April 28, 1980; had continually refused any visitation with S.M.; had continued to express an ongoing fear of S.M.; and had requested, on numerous occasions, termination of the parental relationship with S.M. An allegation that S.M. had failed to resolve her hostile attitude toward P.F. was dismissed. The court ordered termination of S.M.'s parental rights, noting that although there had been evidence sufficient to do so 5 years before, the termination had been taken under advisement solely to give P.F. the opportunity to confront the situation for the benefit of her own mental health.

We think the record shows by clear and convincing evidence that 5 years of therapy failed to improve P.F.'s relationship with her mother and that it was in P.F.'s best interests to terminate S.M.'s parental rights. The natural mother has never fully realized the extent to which she abused her daughter and that it

was her abuse of her daughter that drove them apart. The evidence supports the daughter's belief that her mother sought to regain custody for purposes of revenge.

The appellant contends that the juvenile court erred in basing its determination on the fact that P.F. refuses to have any contact with S.M. The record shows that the juvenile court terminated the parental rights of the natural mother because there is no bond whatsoever between them which might be salvaged. Throughout the entire proceeding, P.F. has maintained that she does not wish to and will not return to or even visit her mother. She has consistently maintained that she does not love her mother.

The appellant relies upon *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 115, 368 N.W.2d 474, 483 (1985), where this court held:

> For the State to now argue that the children have become so "bonded" to their foster parents as to require termination of parental rights in this case is to defy legal logic. By separating a parent from that parent's children for extraordinary lengths of time, the State could justify termination of any parental rights. This cannot be, and is not, the law.

The proposition stated above has no application in this case.

The termination in the case at bar is granted because years of abuse by the natural mother destroyed any bond that the child might ever have had with her. This was evidenced by P.F.'s testimony that she wanted no contact with S.M., regardless of the court's decision.

We have previously recognized the importance of a consistent and stable home environment. *In re Interest of McKinzie*, 212 Neb. 399, 323 N.W.2d 78 (1982). In other cases, we have acknowledged the unacceptability of indefinite foster care where the evidence suggests the need for a fixed and permanent home. *In re Interest of J. and R.*, 216 Neb. 183, 342 N.W.2d 660 (1984). See, also, *In re Interest of D.*, 218 Neb. 23, 352 N.W.2d 566 (1984).

While there is evidence that the appellant did show some progress in therapy, the evidence conclusively shows that all attempts to reunify mother and daughter have failed. There are

no prospects for future reunification. Further, the evidence demonstrates P.F.'s need for a sense of identity, which can only be satisfied by permanent placement.

Since placement with the natural mother is not possible nor advisable and further temporary foster care will not serve P.F.'s best interests, termination of the appellant's parental rights must be granted. S.M.'s efforts at rehabilitation did not and could not undo the harm previously done.

The judgment of the separate juvenile court is affirmed.

AFFIRMED.