IN RE INTEREST OF R.A., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. D.K., APPELLANT.

410 N.W.2d 110

Filed July 31, 1987.    No. 86-964.

Julie A. Frank of Pollak & Frank, for appellant.

Patrick Kelly, Sarpy County Attorney, and Lawrence D. Gendler, for appellee.

Deborah R. Pred of Fiedler, Kushner & Pred, guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

D.K., the mother, appeals from the September 22, 1986, order of the separate juvenile court of Sarpy County, Nebraska, terminating her parental rights to her daughter, R.A.

The child was born on April 24, 1976, to L.A. and D.K. The couple was divorced in February of 1981, with custody of the child awarded to the mother. She returned custody of the child to the father within 3 days following entry of the decree. Later in 1981, after regaining custody of the child, the mother enlisted in the Army and again relinquished custody to the father.

In August of 1983, the father turned custody of the child over to the separate juvenile court and requested its assistance. The mother was unavailable as an immediate custodial parent at that time because she was still in the service and was stationed in Virginia. Prior to the father's request for assistance from the court, the child was hospitalized at the Nebraska Psychiatric Institute from May 6 to July 16, 1983. She was diagnosed there as suffering an adjustment disorder with mixed disturbance of emotion. The hospitalization was precipitated by the child's threats to kill her stepmother and to burn down the family residence. These threats continued after her hospitalization. At that point, the child's father requested that his mother, the child's grandmother, take custody of the child. Subsequent to taking custody of her, the grandmother contacted the court requesting assistance for the child. Upon being detained, the child was placed in Midlands Hospital and, within a week of being there, alleged that she had been sexually abused by her paternal grandfather, A.A.

On August 15, 1983, a petition was filed in the separate juvenile court alleging that the child was homeless, destitute, or without proper support through no one's fault. See Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1982). The child's mother's address was listed as unknown in the petition.

Following an October 4, 1983, hearing on the petition, the child was adjudicated to be a child within the meaning of § 43-247(3)(a) and was placed in the custody of the Nebraska

Department of Social Services. At the October 4 hearing, the father stipulated to the truth of the contents of the petition. The court relied on its own "social file" to establish a factual basis for the stipulation. The social file, otherwise known as the predisposition evaluation, was not offered into evidence. The mother was not present or represented by counsel at this hearing.

Subsequent further dispositional hearings were held on November 23, 1983; April 11, 1984; October 4, 1984; April 18, 1985; October 9, 1985; and April 10, 1986. The mother either appeared with or was represented by counsel at all of these hearings. However, no record of the dispositional hearings was made. The court entered orders pursuant to the hearings requiring the mother to abstain from the consumption or use of alcohol and controlled substances; participate in a Parents United program or its equivalent; participate in counseling; pay the costs of her child's medical care and therapy; submit to chemical and psychological evaluations; complete a parenting program; submit to a home-study evaluation; obtain and maintain housing suitable for herself and her child; and maintain gainful employment. She was also allowed only supervised visitations with her child.

The father relinquished his parental rights to his child on April 4, 1984. From that point on, he and his second wife were no longer subjects of the juvenile court orders.

On June 26, 1986, the Sarpy County deputy county attorney filed a supplemental petition seeking termination of the mother's parental rights to her child. The petition alleged that reasonable efforts under direction of the court had failed to correct the conditions leading to the determination that the child was a child within the meaning of § 43-247(3)(a). Termination was sought pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1984).

On September 15, 1986, a hearing was held on the supplemental petition. The mother was not present but was represented by counsel. The State made an oral request that the court take judicial notice of its own records, more specifically its "social file," which encompassed exhibits 1 through 28. The exhibits consisted of the court's predisposition report and an

addendum to it; reports and letters from the child's counselor; reports of the Child Protective Services workers; letters to the court from the mother; reports from the mother's counselors; further disposition reports of the court; and a psychological evaluation of the mother. The mother's attorney entered hearsay objections to exhibits 1, 2, 3, 4, 8, 9, 10, 11, 16, 17, 19, 21, 22, 23, 24, 25, 26, 27, and 28. The court stated that exhibits 1 through 28 had all been considered in previous proceedings in the case. Judicial notice of those exhibits was taken.

In addition to the aforementioned exhibits, the State introduced the testimony of the child's therapist, Janet Guilfoyle, and that of the Child Protective Services worker then assigned to the case, Ronda Newman. Newman was also called as the mother's sole witness.

On September 22, 1986, the juvenile court found there was clear and convincing evidence to show that reasonable efforts under the direction of the court had failed to correct the conditions originally leading to the determination that the child was a child within the meaning of § 43-247(3)(a). The court also found that it was in the best interests of the child to terminate the mother's parental rights and ordered the mother's parental rights to her child terminated.

On appeal from the order of termination, the mother essentially raises three issues: (1) whether the juvenile court abused its discretion and committed reversible error by admitting exhibits 1, 2, 3, 4, 8, 9, 10, 11, 16, 17, 19, 21, 22, 23, 24, 25, 26, 27, and 28, which consisted of hearsay where said exhibits were admitted solely because they came from the social file maintained by the juvenile court and were originally admitted into the social file without formal offers by any party, thereby denying appellant the opportunity to object to their admission into the file; (2) whether the evidence was sufficient to support the juvenile court's order terminating the mother's parental rights; and (3) whether the finding that reasonable efforts had failed to correct conditions leading to the determination that R.A. was a child within the meaning of § 43-247(3)(a) was contrary to the evidence presented, offered, and received at trial and was contrary to law.

The mother's first assignment of error is basically that she

was denied due process because receipt of the exhibits in question over her hearsay objections denied her the opportunity to cross-examine the witnesses and allowed her parental rights to be terminated on a lesser standard of proof than required.

The issue raised is a result of the juvenile court's failure to make a verbatim record of its dispositional proceedings. Due to that failure, there is no record before this court that the social file exhibits were ever received in evidence prior to their receipt at the termination hearing, that the mother ever had an opportunity to cross-examine the authors of the exhibits, or that she ever had an opportunity to inspect the exhibits prior to their introduction at the adjudication hearing on the supplemental petition. Further, there is no foundation evidence for any of these exhibits.

During the course of the October 4, 1983, adjudication on the original petition, the juvenile court determined there was a factual basis for the father's stipulation to the allegations in the petition, based on a predisposition evaluation which was not then received in evidence. The court did so to protect both the child's and her father's interests in confidentiality. Upon finding the child to be a child within the meaning of § 43-247(3)(a), the court made an immediate dispositional inquiry. Again, with the court, the State, and the guardian ad litem all citing concerns of confidentiality, disposition was had off the record. No verbatim record was made of subsequent further dispositional hearings, although they are evidenced by the court's findings and orders. No explanation is offered as to why a record of these proceedings was not made.

In *State v. Norwood*, 203 Neb. 201, 204-05, 277 N.W.2d 709, 711 (1979), this court indicated that "[a] court must take judicial notice of its own records in the case under consideration" and that it "has a right to examine its own records and take judicial notice of its own proceedings and judgment in an interwoven and dependent controversy where the same matters have already been considered and determined." Like the case at bar, *Norwood* involved a juvenile court's taking judicial notice of its prior proceedings in a termination of parental rights adjudication. Under the

aforementioned rules, this court found no error in the court's consideration of its earlier proceedings in the *Norwood* case. The rules relied on in *Norwood* imply that exhibits considered in prior proceedings may be noticed pursuant to an examination of its records of those proceedings. In effect, that was what the juvenile court attempted to do in this case.

Nevertheless, it is questionable whether the juvenile court could take judicial notice of the exhibits in question in this case under the authority of *Norwood, supra.* In this case, there is no verbatim record of the dispositional hearings at which the exhibits were allegedly considered.

In *In re Interest of D.*, 209 Neb. 529, 531, 308 N.W.2d 729, 731 (1981), we stated that in termination cases, because the record must establish by clear and convincing evidence the basis for termination of parental rights, observance of more formal court procedures is "encouraged." In that case, the evidence before the court consisted mostly of letters and unsworn testimony which was not objected to. As such, it was properly before the court. Nevertheless, this court expressed concern that there was no opportunity for cross-examination of the authors of the various reports to determine the bases of their conclusions.

Absent a verbatim record of the prior dispositional proceedings in this case, there is no foundation evidence for the questioned exhibits and no evidence that there was an opportunity to cross-examine the authors of the exhibits as to their contents, or of their availability to the mother or her counsel prior to the termination hearing. The fact that the juvenile court stated that it had previously considered the exhibits does not alleviate these problems. Because the strict rules of evidence do not apply to dispositional hearings, there are no assurances that the exhibits, even if considered at those hearings, were made available to the mother or her counsel. Neb. Rev. Stat. § 43-283 (Reissue 1984).

The Supreme Court of Iowa has previously set out safeguards for taking judicial notice of CHINA (child in need of assistance) proceedings in subsequent termination proceedings. *In Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980). The safeguards include:

> Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling in the termination proceeding should state and describe what it is the court is judicially noticing.

*Id.* at 278. The purpose of these safeguards is to ensure a meaningful review. *Id.*

When the State seeks to terminate parental rights, it is required to do so by fundamentally fair procedures which satisfy the requirements of due process. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Parents in such proceedings have a right to cross-examine adverse witnesses. See, *In re Randy Scott B.*, 511 A.2d 450 (Me. 1986); *G.E. Y. v. Cabinet for Human Resources*, 701 S.W.2d 713 (Ky. App. 1985); *In re Gary U.*, 136 Cal. App. 3d 494, 186 Cal. Rptr. 316 (1982). Cross-examination is a means of exercising the right of confrontation, the purpose of which is "to advance practical concern for the accuracy of the truth determination process . . . ." *State v. Roy*, 214 Neb. 204, 207, 333 N.W.2d 398, 401 (1983).

Where hearsay statements, such as those contained in the exhibits in this case, are admitted over objection without foundation evidence, opportunity to cross-examine the authors, or even any opportunity to view the exhibits prior to their offer at the termination hearing, there is little from which this court can ascertain the reliability or trustworthiness of the exhibits. By taking judicial notice of the exhibits in question, the juvenile court failed to accord the mother her due process right of cross-examination.

Further, the exhibits were clearly hearsay statements. Termination proceedings are subject to the customary rules of evidence applied in nonjury cases. Neb. Rev. Stat. § 43-279(1) (Reissue 1984). The record of the termination hearing does not contain the evidence necessary to justify admission of the exhibits under any exception to the hearsay rule. The guardian ad litem suggests the caseworker's and other reports were admissible under Neb. Rev. Stat. § 27-803(7) (Reissue 1985). However, the record reflects no evidence to satisfy the notice requirements of that section. The exhibits in question were

clearly hearsay and, on the record of this case, were inadmissible as exceptions to the hearsay rule or by way of judicial notice.

The concern for the child's confidentiality exhibited by the juvenile court, the State, and the guardian ad litem is understandable. But it must be remembered that rehabilitative efforts may fail following a § 43-247(3)(a) adjudication. The failure of such efforts may provide the basis for termination of parental rights, where termination is in the child's best interests. § 43-292(6). If the State wishes to rely on evidence from dispositional proceedings to support a termination based on failed efforts at rehabilitation, it must see that a verbatim record is made so that the testimony and other foundation evidence is preserved. Otherwise, it is not possible for this court to make a meaningful review of the proceeding. Separate juvenile courts are courts of record and are not free to shield their actions behind a cloak of secrecy by failing to make a verbatim record of the evidentiary proceedings before them. See Neb. Rev. Stat. § 43-2,111 (Reissue 1984).

In this particular case, any error in receiving the exhibits was not fatal to the juvenile court's determination that the mother's parental rights should be terminated. The court had before it other evidence, in the form of testimony and exhibits from the social file stipulated to by the mother's counsel, which is sufficient to sustain the order of termination.

A termination order is reviewed de novo, and evidence erroneously admitted is not considered. *In re Interest of C.G.C.S.,* 225 Neb. 605, 407 N.W.2d 196 (1987). Such an order must be supported by clear and convincing evidence and should only be issued when there is no reasonable alternative. *In re Interest of J. W.,* 224 Neb. 897, 402 N.W.2d 671 (1987). Where a parent fails to rehabilitate herself within a reasonable period of time, the best interests of the child may require that a final disposition be made without delay. *In re Interest of J. W., supra.*

As previously noted, the various orders entered pursuant to the dispositional hearings required the mother to abstain from the use of alcohol or controlled substances; participate in a Parents United program or its equivalent; participate in

counseling; pay the costs of her child's medical care and therapy; submit to chemical and psychological evaluations; complete a parenting program; submit to a home-study evaluation; obtain and maintain housing suitable for herself and her child; and maintain gainful employment. She was also ordered to have only supervised visitations with her child.

The record shows a lack of compliance by the mother with these orders in several areas.

In regard to the evaluations, the mother was ordered to submit to a chemical evaluation on April 18, 1985, and to an updated psychological evaluation on April 10, 1986. Ronda Newman, the Child Protective Services worker on the case, testified at the September 15, 1986, adjudication hearing that she had advised the mother in August of 1986 of the petition to terminate and of the mother's need to schedule the chemical and psychological evaluations. The mother had indicated that she would schedule the evaluations and, according to Newman, understood that her failure to do so might result in a termination of her parental rights. The mother never responded to Newman's requests that she make appointments for the evaluations and to notify the court workers as to where and with whom they were scheduled. Newman also testified that the mother knew how to contact Newman if she desired assistance.

As to participation in the Parents United program, Janet Guilfoyle, the child's therapist, testified that based on what she had learned through "monthly staffings," the mother's attendance was inconsistent.

In regard to counseling, the evidence indicates that the mother participated in counseling off and on from April 1984 to either June or August of 1986. In exhibit 7, a September 28, 1984, letter addressed to the juvenile probation officer, the mother's counselor in Florida indicated that parenting skills had been discussed in several sessions and that continued counseling on a regular basis would be beneficial if the mother was awarded custody of her child. On March 29, 1985, in a letter marked exhibit 15, the mother's Omaha counselor stated that "[t]here is a lot of work that needs to be done, so I do see [the mother] as having to be in therapy a considerable length of time before a judgement could be made as to her ability to

parent [her child] successfully."

In her own letter of September 24, 1985, the mother revealed that she was suffering from bulimia. The condition had been aggravated by worries about her daughter, finances, and employment. She indicated that she had begun to counsel with a Dr. Smith in Florida, in an attempt to regain her health. Ronda Newman testified she was unable to ascertain the extent of the mother's involvement in counseling with Dr. Smith, as the mother did not sign a release of her records until the records were subpoenaed by the State on August 18, 1986. Those records were not received in evidence for purposes of this adjudication. However, it is clear that the mother had terminated her counseling with Dr. Smith either prior to or during the pendency of the supplemental petition for termination filed on June 26, 1986.

In terms of supervised visitations, it is clear that the mother did participate in some visitations with her daughter when she (the mother) was in Omaha. The child was originally fearful of the visitations. That fear diminished to some extent over time, but Janet Guilfoyle testified that there had not been much change in the quality of the mother's visits with the child. Also, there had been some problems in terms of the child's behavior during and following the visits. Repeated recommendations made to improve their interactions were not utilized by the mother.

The record shows that the mother resided in Florida from at least April to November of 1984. In November 1984, she returned to Omaha. The mother returned to Florida in June of 1985 for health and financial reasons. She did not attend the September 15, 1986, termination hearing.

Janet Guilfoyle testified that if the goal of juvenile proceedings and rehabilitative efforts is reunification, as was the case here, it is almost essential that the parent reside in the area so that the parent can have ongoing contact with the child. Once the mother returned to Florida in June of 1985, there was minimal correspondence between her and her daughter. Prior to the mother's brief stay in Omaha and her subsequent return to Florida, her Florida counselor indicated that it was difficult to emphasize any particular parenting skills with the mother due

to lack of contact with the child.

The mother complains that the termination of her parental rights is, in essence, punishment for her moving to Florida, which allowed her to improve her life. The evidence, however, is clear that the move did not serve to better her relationship with her child. There was little communication or contact subsequent to the move, which the testimony indicates was necessary for successful reunification. A voluntary departure from the state may be viewed as an abandonment of one's children and cannot be used as an excuse for the impossibility of compliance with a court-ordered plan of rehabilitation. *In re Interest of Moen*, 208 Neb. 337, 303 N.W.2d 303 (1981).

Further, the fact of participation in certain elements of the court-ordered plan does not necessarily prevent the court from entering an order of termination where the parent has made no progress toward rehabilitation. A parent is required not only to follow the plan of the court to rehabilitate herself but also to make reasonable efforts on her own to bring about rehabilitation. *In re Interest of C.G.C.S.*, 225 Neb. 605, 407 N.W.2d 196 (1987). In addition to the obstacles to reunification presented by the mother's move to Florida, there is evidence that she has not adequately dealt with her problems in regard to her abuse of her daughter. Her child was originally referred to Janet Guilfoyle because of past abuse by several people, including the mother. In 1984, the mother admitted to her Florida counselor that she had been guilty of abusing her daughter. She made similar admissions to her Nebraska counselor, but denied all but a few instances subsequent to her child's reaching age 1. She also has denied allegations by her child of sexual abuse. In an April 1985 report to the court, the Child Protective Services worker reported that the mother had been fluctuating between admitting and denying any physical abuse of her daughter. Janet Guilfoyle also testified that the mother failed to ever address the allegations of sexual abuse. Additionally, there is evidence that the mother failed to follow recommendations for improving her interactions with her daughter during supervised visitations. Clearly, the evidence shows not only a substantial lack of compliance with the plan but also a lack of progress.

The evidence also supports the determination that it is in the child's best interests to terminate the mother's parental rights. According to Janet Guilfoyle, the child has made great progress in therapy. Nevertheless, it was Guilfoyle's opinion that the child still exhibited some behaviors of an abused child and that, at 10 years of age, she was in crucial need of a permanent placement. Further, Guilfoyle testified that the placement should be in a situation where the child would receive a lot of consistent parenting, nurturing, and stability.

The mother's on-again, off-again relationship with her child has failed to provide the necessary consistency or stability. At one point prior to the mother's departure for Florida in June of 1985, her child indicated that she had four last names, including that of her foster parents and that of her mother. When the mother subsequently left Nebraska, her child was very angry and disappointed.

Combined with the above, evidence of the mother's progress and compliance shows that she will not provide the necessary parental skills and guidance to her child. The mother's lack of contact with her child, her need for long-term counseling, the fact that she had ended counseling at the time of the termination hearing, and her own needs for proper nurturing are all circumstances supporting the juvenile court's determination that it was in the child's best interests to terminate the mother's parental rights.

As we have frequently stated, a child's future need not be subject to the risks of awaiting uncertain parental maturity. *In re Interest of C.G.C.S., supra.* Indefinite foster care is not an acceptable alternative where the evidence suggests the need for a fixed and permanent home. *In re Interest of P.F.*, 222 Neb. 44, 381 N.W.2d 921 (1986).

The child has been a ward of the State since August of 1983. The mother had not had custody of her child for some 2 years prior to that time. After 3 years of rehabilitative efforts the evidence supports the need for permanent placement of the child and shows a lack of rehabilitation by the mother. The court properly entered its order of termination.

Finally, the mother claims that the order of termination was contrary to law because the conditions leading to the

determination that her child was a child within the meaning of § 43-247(3)(a) had nothing to do with her. Thus, she concludes that her parental rights could not be terminated on grounds that reasonable efforts had failed to correct the conditions leading to the determination that her child was a child within the meaning of § 43-247(3)(a). We do not agree.

The fact of the matter is that at the time of the original adjudication, the mother had twice relinquished custody of her child to the father following their divorce. The mother relinquished custody when she went into the Army and, upon leaving the service, returned to Florida to live with her parents instead of returning to her daughter, who was then in the custody of the State. Certainly, the mother's unavailability as a custodial parent at the time of the original adjudication was a condition leading to the determination that the child was "without proper support through no one's fault."

We conclude that the separate juvenile court's order terminating the mother's parental rights is supported by the evidence and was not contrary to law. The judgment is affirmed.

AFFIRMED.