IN RE INTEREST OF C.A., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. B.T., APPELLANT.
457 N.W.2d 822

Filed July 20, 1990.   No. 89-1404.

Elizabeth C. Schrock for appellant.

Karen L. Vervaecke, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Pursuant to the Nebraska Juvenile Code, Neb. Rev. Stat. §§ 43-245 et seq. (Reissue 1988), the separate juvenile court of Douglas County, on November 19, 1986, conducted an adjudication hearing attended by C.A.'s biological parents, lawyers for the parents, C.A.'s guardian ad litem, the State's attorney, and a representative of the Nebraska Department of Social Services (DSS). The court determined that C.A. was a juvenile within § 43-247(3)(a) (a child who is in a situation dangerous to life or limb or injurious to the health or morals of the child). On November 6, 1989, the juvenile court terminated parental rights concerning C.A., on account of parental abandonment of C.A. for more than 6 months immediately prior to the State's filing its petition for termination of parental rights. See § 43-292(1). C.A.'s mother, B.T., has appealed, but C.A.'s father has not appealed.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. [Citations omitted.] In the

absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence. [Citations omitted.] A juvenile's best interests are one of the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code.

*In re Interest of T.C.*, 226 Neb. 116, 117-18, 409 N.W.2d 607, 609 (1987); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990).

## BACKGROUND

*Adjudication and Disposition Proceedings re C.A.'s Father.*

C.A. was born on January 13, 1982, to R.A. and B.T., who had been married since October 1979. The marriage of R.A. and B.T. was dissolved in September 1985, and R.A. was granted custody of his daughter, C.A.

In January 1986, after the Omaha Police Division received a complaint that R.A. was sexually abusing C.A., the child was placed in the temporary custody of DSS. On February 13, 1986, the State filed a petition and alleged that C.A. was a child within § 43-247(3)(a) on account of R.A.'s sexual misconduct with C.A. Pending adjudication, C.A. remained in the temporary custody of DSS. Also, during pendency of the adjudication proceedings, the child's mother, B.T., married J.T. on March 28, 1986, and requested temporary custody of C.A. in the proceedings pending before the juvenile court, a request which the court denied.

At the adjudication hearing on November 19, 1986, the court found the allegations of the State's petition to be true, determined that C.A. was a juvenile within § 43-247(3)(a), and, at a dispositional hearing on July 9, 1987, continued DSS' temporary custody of C.A. for placement with B.T. and J.T., the child's stepfather. The court further ordered that B.T. and J.T. participate in counseling and maintain a suitable residence and income, and also ordered that the child's father, R.A., submit to a psychological evaluation and maintain visitation

with C.A. under DSS supervision.

*Subsequent Review Proceedings.*

B.T. and J.T., without court approval, took C.A. to Joplin, Missouri, in December 1987. The court record does not disclose the reason for that change of residence. Around February 17, 1988, B.T. "decided that she no longer wanted to care for [C.A.]" and voluntarily gave C.A. to the Missouri Department of Social Services in Joplin, which, in turn, returned C.A. to DSS in Nebraska.

The court held a review hearing on February 23, 1988. B.T. did not attend the hearing, but remained in Joplin. The court ordered that C.A. remain in DSS' temporary custody for "appropriate foster care placement." On March 16, the court ordered that C.A. should receive therapy arranged by DSS. In April, B.T. filed, but later withdrew, a motion to transfer the proceedings to Missouri. Although notified, B.T. failed to attend additional review hearings held on June 21 and September 23, but was represented by her lawyer at those hearings, in which the court continued DSS' temporary custody of C.A. During the September hearing, the court was informed that C.A. was "experiencing a lot of depression from being abandoned by her mother."

Without having had any contact with C.A. for nearly a year, B.T. arrived in Omaha on February 10, 1989, with the expressed intention of regaining custody of her daughter. Kara Murphy, a juvenile court probation officer, told B.T. that she should meet with caseworkers for C.A. At a meeting on March 1, which included B.T.; Betty Burton, who was a Child Protective Services worker; C.A.'s therapist; and Murphy, B.T. was told that she would have to participate in counseling as a condition for visiting C.A. At a review hearing held on April 17, Murphy testified:

> I arranged counseling with Sue Willig from Lutheran Family Services for [B.T.]. I informed [B.T.] of the arrangement and I called the next day to see if she had made contact with this therapist at which time I was informed she had returned to Missouri. She later returned and notified her attorney that she decided prior to any

counseling or any attempt to work on this issue that the problems of [C.A.] were too severe and she had changed her mind. She has decided she no longer wanted to be her — part of her life. It was decided at the meeting that even if [B.T.] decided not to try for reunification with [C.A.], she make a commitment to meet in therapy with [C.A.] to close out some old issues with her because she has severe feelings of abandonment and [B.T.] agreed to do that. She failed to do this.

B.T. did not attend the April 17 hearing, but was represented by counsel who, in reference to Murphy's testimony, conceded that "[e]verything that has been said appears to be correct." B.T.'s counsel did state, however, that B.T. was attempting to exchange letters with C.A. Also, at the April 17 hearing, the court, without objection, received Burton's DSS case report regarding the meeting between B.T. and the caseworkers for C.A.:

A meeting was arranged for March 1, 1989, with [C.A.'s] primary therapist, Lisa Richardson, so that [C.A.'s] emotional state resulting from the relationship between her and [B.T.], could be explained. The therapist did explain [C.A.'s] complex needs and recommended that [B.T.] become involved in a plan. The plan included [B.T.'s] need to make a firm commitment to work hard and accept [C.A.] as she is because to give up again would be devastating and destroy [C.A.]. We explained that [C.A.] needed structure, consistency and nurturing and she needed to equip herself with these essential parenting qualities. She claims she really wanted reunification with this child. We explained that since she felt that she could not handle [C.A.] in the past, nothing had presently changed with [C.A.] that would make it any easier. She would need to make a commitment and stick by the commitment so that she could help [C.A.]. It is felt that by [B.T.'s] response, that she did not really want to accept any responsibility. Shortly after that meeting, she left town without any explanation. If she had made a commitment to work, an actual visit would have been arranged between her and [C.A.].

The child's father, R.A., did not attend the hearing. R.A. had never visited C.A. after the hearing in November 1988 and, since November 1988, had not participated in counseling ordered by the court.

At the conclusion of the April 17 hearing, the court ordered that C.A. continue receiving therapy and remain in DSS' temporary custody.

*Termination Proceedings.*

On May 2, 1989, the State filed a motion or petition to terminate the parental rights of B.T. and R.A. Regarding the child's mother, the State alleged that B.T. had abandoned C.A. "for a period in excess of six months immediately preceding the filing of said motion herein, to wit: [B.T.] has had no contact with said child, nor provided any financial or emotional support for said child for over one year." In her answer, B.T. denied that she had abandoned C.A., "in that on February 10, 1989, the natural mother returned to Omaha and immediately requested a visit with her daughter. This request was denied."

A hearing for termination of parental rights was held on November 6, 1989. Although C.A.'s parents had approximately 6 months' notice of the State's motion to terminate their parental rights, neither B.T., who was still residing in Joplin, nor R.A. appeared at the hearing, although B.T.'s lawyer appeared on her behalf.

At the termination hearing, Burton and Murphy recounted the circumstances regarding B.T.'s visit to Omaha in February 1989 and subsequent return to Missouri shortly after the March 1 meeting with C.A.'s caseworkers. Burton explained why it was necessary that B.T. participate in therapy before resuming contact with C.A.: "[B.T.] had taken [C.A.] to the Missouri Department of Social Services and indicated to them at that time that she didn't want to care for her and that [would be] devastating to [C.A.] for that to happen again." Murphy testified that B.T. stayed at the Vincent House, a shelter for the homeless, when she appeared in Omaha in February 1989. Murphy also testified that at the March 1 conference with C.A.'s caseworkers, B.T. was initially willing to stay a "few short months" so that she might be reunited with C.A.

However, B.T. departed for Missouri after arrangements for her counseling had been made.

Although B.T. did not present any witness at the termination hearing, it was noted that B.T. had sent C.A. four letters and a birthday card during the period when, according to the State, B.T. had abandoned C.A.

At the conclusion of the hearing, the court, having found that C.A. was a child within the meaning of § 43-247(3)(a), determined that the evidence clearly and convincingly established that C.A.'s parents, B.T. and R.A., had abandoned C.A. for the 6 months immediately preceding commencement of the termination proceedings, that is, the 6 months before the State filed its petition. See § 43-292(1). The court concluded that the best interests of C.A. required termination of parental rights and, therefore, terminated the parental rights of B.T. and R.A. concerning C.A.

## ASSIGNED ERRORS

B.T. contends that the court erred in the conclusion that there was clear and convincing evidence of parental abandonment as a basis to terminate her parental rights concerning C.A. B.T. also argues that the court erred in finding that the termination of B.T.'s parental rights was in C.A.'s best interests.

## TERMINATION OF B.T.'S PARENTAL RIGHTS

Concerning the termination of parental rights on account of abandonment, this court has recognized that

> [t]he Nebraska Juvenile Code provides that parental rights may be terminated when the best interests of a child require the termination of parental rights. See § 43-292. "A juvenile's best interests are the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code." *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 267, 417 N.W.2d 147, 158 (1987). "In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." *In re Interest of T.C.*, 226 Neb. 116,

117, 409 N.W.2d 607, 609 (1987).

Among the bases for termination of parental rights, § 43-292 includes: "(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition . . . ."

"Abandonment," for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child. See *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988). *In re Interest of J.L.M. et al.*, 234 Neb. 381, 398, 451 N.W.2d 377, 388 (1990). Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends on parental intent, which may be determined by circumstantial evidence. See *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988).

B.T. argues that she attempted to maintain physical contact with C.A. in February 1989, which would have been within the 6 months before the State filed its petition to terminate parental rights, but was denied contact by DSS and C.A.'s therapist. According to B.T., DSS "felt that it was more important for [B.T.] to jump through a series of 'commitment hoops' before she would be allowed to see her daughter." Brief for appellant at 11.

Regarding B.T.'s claim that she was improperly prevented from visiting C.A., we note that § 43-284 of the juvenile code provides:

When any juvenile is adjudged to be under subdivision (3) of section 43-247, the court . . . may make an order committing the juvenile to the . . . (5) care and custody of the Department of Social Services. . . . The Department of Social Services shall have the authority to determine the care, placement, medical services, psychiatric services, training, and expenditures on behalf of each juvenile committed to it.

Section 43-284 does not authorize DSS to determine or place restrictions on parental visitation rights. Parental visitation rights, as a subject within the Nebraska Juvenile Code, are

matters for judicial determination. Illustrative of the need for judicial determination regarding a matter pertinent to children within a court's jurisdiction is *Ensrud v. Ensrud*, 230 Neb. 720, 729, 433 N.W.2d 192, 199 (1988), where the trial court, pursuant to a dissolution decree, ordered that physical custody of Ensruds' child was "exercisable as directed by the child custody officer." In disapproving of the trial court's delegatory action, we stated:

> In *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), this court considered and reversed a "trial court's order placing in a psychologist the authority to effectively determine visitation, and to control the extent and time of such visitation." *Id*. at 200, 297 N.W.2d at 762. In disapproving the judicially conferred authority for the psychologist's determination of visitation rights, this court stated: "Such delegation could result in the denial of proper visitation rights of the noncustodial parent. . . . The responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties. [Citation omitted.]" *Id*. at 200-01, 297 N.W.2d at 762.
>
> . . . .
>
> A decision concerning physical custody . . . which necessarily involves ascertaining the best interests of the child, is a matter for constitutionally authorized judicial determination. Such judicial authority cannot and shall not be delegated to administrative personnel, who assist a court charged with the responsibility of determining the best interests of a child involved in a dissolution proceeding.

*Ensrud, supra* at 730-31, 433 N.W.2d at 199.

Notwithstanding DSS' lack of authority to determine parental visitation rights, the present appeal is distinguishable from *Ensrud* and *Deacon*, since the juvenile court did not grant or delegate to DSS any authority to determine visitation rights concerning C.A. B.T., who was represented by a lawyer, could have requested that the court examine DSS' directive that B.T.

obtain counseling as a condition for visiting C.A. However, B.T. chose to return to Missouri without any further contact with DSS or the court.

Furthermore, we also point out that B.T.'s actions during the 6 months preceding the State's motion to terminate cannot be viewed in total isolation from B.T.'s previous conduct and absence from C.A., especially since DSS' reluctance to allow B.T. to see C.A. was the result of B.T.'s past indifference to C.A.'s well-being. B.T.'s indifference was clearly exhibited in her voluntarily delivering C.A. to the Missouri Department of Social Services; in failing to have any contact with C.A., or to make any effort to contact the child, from February 1988 to February 1989; and, without excuse or justification, in failing to appear at court hearings in 1988 and 1989 concerning C.A. We note that child custody by DSS gives the department some authority similar to a guardian's authority. See § 43-285: "In any case when the court shall award a juvenile to the care of [DSS], the juvenile shall, unless otherwise ordered, become a ward and be subject to the guardianship of the department . . . ." In view of § 43-285, DSS, although lacking authority to determine parental visitation rights, was, subject to judicial review, authorized to set conditions beneficial for reestablishment of contact between C.A. and B.T. Overall, B.T. still had the ability to secure visitation rights through the juvenile court.

Thus, we conclude that B.T.'s 1989 appearance for a visit with C.A. in Omaha and DSS' response do not excuse or justify B.T.'s extended absence from C.A.'s life. B.T. also contends, however, that " 'physical presence' " is not a "pivotal requirement in a determination of abandonment," and, thus, contact was maintained with C.A. "throughout the six months immediately prior to the filing of the Petition" because "the record clearly shows that [B.T.] wrote letters and a card . . . ." Brief for appellant at 15.

" 'Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.' " *In re Interest of J.M.D.*, 233 Neb. 540, 543, 446 N.W.2d 233, 235 (1989). While we do not ignore B.T.'s letters and card to C.A., nevertheless, under the

circumstances, such actions by B.T., in the context of B.T.'s past behavior, are small tokens of parental affection for a child and an inadequate substitute for parental presence in a child's life.

From our de novo review of the record, we conclude that the evidence is clear and convincing that B.T. abandoned C.A. for a period of 6 months before the State filed its petition for termination of B.T.'s parental rights. It is also clear that the State has established that termination of B.T.'s parental rights is in the best interests of C.A.

Thus, we conclude that the juvenile court was correct in terminating the parental rights of B.T., and, accordingly, the juvenile court's judgment is affirmed.

AFFIRMED.