IN RE INTEREST OF M.P., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. J.P., APPELLANT.
472 N.W.2d 432

Filed August 2, 1991.   No. 90-1026.

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Mark J. Young, Deputy Hall County Attorney, for appellee.

Daniel J. Thayer, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

J.P. appeals from the judgment of the county court for Hall County, sitting as a juvenile court pursuant to Neb. Rev. Stat. § 43-245 (Cum. Supp. 1990) of the Nebraska Juvenile Code, by which J.P.'s parental rights in her 5-year-old son, M.P., were terminated as the result of J.P.'s failure to comply with a court-ordered rehabilitation plan.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147

(1987). Accord, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987).

The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is "clear and convincing."

*In re Interest of J.S., A.C., and C.S., supra* at 267, 417 N.W.2d at 158. See, also, *In re Interest of T.C., supra.* "[W]hen a parent fails to make reasonable efforts to comply with a court-ordered rehabilitative plan, the parent's failure presents an independent reason justifying termination of parental rights." *In re Interest of J.S., A.C., and C.S., supra* at 266, 417 N.W.2d at 158. Accord, *In re Interest of A.H., supra*; *In re Interest of L.O. and B.O.*, 229 Neb. 889, 429 N.W.2d 388 (1988).

[R]egarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child.

*In re Interest of J.S., A.C., and C.S., supra* at 267, 417 N.W.2d at 158. Accord, *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990); *In re Interest of L.O. and B.O., supra*; *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988).

"In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible

when the basis for such termination is proved by clear and convincing evidence." *In re Interest of T.C., supra* at 117, 409 N.W.2d at 609. Accord, *In re Interest of A.H., supra*; *In re Interest of J.S., A.C., and C.S., supra.* " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Interest of J.S., A.C., and C.S., supra* at 266, 417 N.W.2d at 157 (quoting from *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984)).

## BACKGROUND FOR PARENTAL
## RIGHTS TERMINATION

On July 21, 1988, the county court conducted an adjudication hearing attended by J.P., who is M.P.'s biological mother; J.P.'s lawyer; the guardian ad litem for M.P.; the county attorney for Hall County; and a representative from the Nebraska Department of Social Services (DSS). The court determined that M.P., born February 19, 1985, was a juvenile within the purview of the Nebraska Juvenile Code. See Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988). All the afore-mentioned persons attended a hearing on September 15, 1988, at which the court, after receipt of evidence relative to J.P.'s use of controlled substances, placed M.P.'s custody with DSS and ordered a rehabilitation plan for J.P., which, without objection, included the requirement that J.P. refrain from use of alcohol and drugs. Through a series of review hearings, the court ordered continuation of the rehabilitation plan for J.P. As the result of a review hearing on October 26, 1989, J.P. obtained physical custody of M.P., but the rehabilitation plan, including the prohibition against J.P.'s use of alcohol and drugs, remained in effect.

On May 27, 1990, police and paramedics, responding to a call from an undisclosed source, found J.P. delirious in the bedroom of her home. Beneath J.P., who was clad in pajamas, a police officer found a hypodermic syringe, and he noted "fresh needle marks" on J.P.'s abdomen. M.P. was not at home, but was later taken to the home of J.P.'s brother. The paramedics transported J.P. to a Grand Island hospital where

she was admitted to the emergency room and received medical attention. On September 11 the county attorney filed a motion to terminate J.P.'s parental rights and, as grounds for termination, alleged J.P.'s habitual use of liquor or narcotic drugs to the serious detriment of M.P., see Neb. Rev. Stat. § 43-292(4) (Reissue 1988), and J.P.'s failure to comply with the rehabilitation plan, which was designed to correct the conditions leading to the adjudication that M.P. was a child within the Nebraska Juvenile Code. See § 43-292(6). M.P.'s father was not involved in the termination proceedings.

## EVIDENCE FOR TERMINATION
## OF PARENTAL RIGHTS

Over J.P.'s objection, the court allowed a DSS caseworker assigned to J.P. and M.P. to testify in an opinion that M.P.'s best interests necessitated termination of J.P.'s parental rights. Also over J.P.'s objection, the court received a Grand Island police officer's testimony that J.P. was arrested in August 1990 for drunk driving. Although J.P., through her assignments of error, complains about the testimony from the DSS caseworker and the police officer, in our de novo review we disregard that particular testimony and direct our attention to other probative evidence on the question whether J.P.'s parental rights in M.P. should be terminated.

In connection with a physical injury and anxiety, J.P. received various medications during 1988 through her physician, including Valium, a tranquilizer, and Bancap, an addictive painkiller issued in capsule form. In a meticulous itemization of the medications which he prescribed for J.P., the physician designated the various medications by name and individual prescription or refill. According to J.P.'s physician, Dilaudid and Talwin were not among the medications prescribed for J.P. In any event, J.P. frequently obtained refills for the Bancap and, in May 1990, unbeknown to her physician, was "grinding up" Bancap capsules, which were then mixed with water to "hit" or "shoot" the liquid composition, that is, inject the concoction intravenously. Concerning the intravenous administration of Bancap, J.P. explained: "Because being a drug abuser through the past, I was suffering

such severe pain that I thought in my mind that the pain would go away faster."

When J.P. arrived at the emergency room, a physician with a specialty in internal medicine examined her and diagnosed her condition as an "[e]pidural abscess . . . a . . . staph infection in the area of L4, L5 . . . which had impinged upon her spinal cord. A pocket of pus on her spinal cord." According to the internist, J.P. was "malnourished," and her lumbar problem existed because J.P. "had multiple skin infection sites from, obviously, intravenous injections with staph abscesses on the skin in multiple locations." Thus, the staph infection resulted from J.P.'s "intravenous drug use" and accounted for her delirious condition observed by police and paramedics on their arrival at J.P.'s home. Also, the physician noted that there were "multiple injection sites about [J.P.'s] body" and that J.P.'s intravenous drug use had "almost killed her." As a result of his conversations with J.P., the physician learned that in addition to Bancap, J.P. had intravenously taken Dilaudid, an opiate and narcotic analgesic which is "a close cousin to morphine," and Talwin, a potent synthetic narcotic analgesic. Both Dilaudid and Talwin are "controlled substances," but neither had been prescribed by J.P.'s physician.

Two psychologists with several years' experience testified. One testified that J.P. understood the "seriousness of drug addiction" and that J.P. was "very well aware of jeopardizing herself and her son if she went back to that kind of living." The other testified that an illicit controlled substance in the home "would be detrimental to — to any child's well-being."

In view of all the foregoing, the court concluded that the evidence clearly and convincingly established that J.P. had failed to rehabilitate herself regarding her drug abuse and that the best interests of M.P. required termination of J.P.'s parental rights concerning M.P.

In unequivocal language, the court-ordered plan for J.P.'s rehabilitation forbade unauthorized use of a controlled substance. Apart from her unusual administration of Bancap, a narcotic obtained by her physician's prescription, J.P. acknowledged her intravenous injection of two controlled substances, Dilaudid and Talwin, narcotic analgesics which she

undoubtedly obtained without her physician's prescription, since neither Dilaudid nor Talwin was mentioned among the narcotics prescribed. Testimony from the psychologists established that J.P. recognized the danger to herself and her child in a lifestyle involving illicit drug addiction. Implicit in the psychologists' testimony is the premise that the home must be a child's refuge from today's widespread abuse and misuse of controlled substances as counterfeit passports from the reality of life. In J.P.'s situation, the home was a stage for a play with one inevitable sorry ending, a tragedy for which a child might have been a spectator, but need not become a player. See, *In re Interest of H.P.A.*, 237 Neb. 410, 466 N.W.2d 90 (1991); *In re Interest of Q.R. and D.R.*, 231 Neb. 791, 438 N.W.2d 146 (1989).

Hence, from our de novo review, we conclude that the evidence clearly and convincingly establishes that J.P. willfully failed to comply with the court-ordered plan of rehabilitation and that, under the circumstances, the best interests of M.P. require termination of J.P.'s parental rights in her child. Consequently, we affirm the judgment of the county court for Hall County.

AFFIRMED.

BOSLAUGH, J., concurs in the result.