IN RE INTEREST OF C.K., L.K., AND G.K., CHILDREN UNDER 18
YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. P.S., APPELLANT.
484 N.W.2d 68

Filed May 15, 1992.    Nos. S-91-307, S-91-308.

Richard B. Register for appellant.

Dean Skokan, Dodge County Attorney, and Joe Stecher for appellee.

Larry C. Johnson, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

The biological mother of three children, Lloyd, born January 9, 1984; Gena, born May 12, 1985; and Christy, born October 28, 1986, appeals from the judgments of the county court for Dodge County, sitting as a juvenile court pursuant to Neb. Rev. Stat. § 43-245 (Cum. Supp. 1990), which terminated the mother's parental rights concerning her children. Termination was based on Neb. Rev. Stat. § 43-292(1) (Reissue 1988) (abandonment of a child for at least 6 months immediately before the filing of a petition to terminate parental rights), § 43-292(2) (substantial and continuous or repeated neglect of a juvenile and refusal to provide parental care and protection for the juvenile), and the court's conclusion that termination of parental rights was in the children's best interests. The children's biological father is not involved in these appeals. We affirm.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental

rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

*In re Interest of M.P.*, 238 Neb. 857, 858, 472 N.W.2d 432, 434 (1991). Accord, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987); *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987).

"The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is 'clear and convincing.' "

*In re Interest of M.P.*, 238 Neb. at 859, 472 N.W.2d at 434 (quoting *In re Interest of J.S., A.C., and C.S., supra*). See, also, *In re Interest of T.C., supra*.

"In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." *In re Interest of T.C., supra* at 117, 409 N.W.2d at 609. Accord, *In re Interest of A.H., supra*; *In re Interest of J.S., A.C., and C.S., supra.* " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Interest of J.S., A.C., and C.S., supra* at 266, 417 N.W.2d at 157 (quoting from *Castellano*

*v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984)).
*In re Interest of M.P.*, 238 Neb. at 859-60, 472 N.W.2d at 434.

## BACKGROUND FOR PARENTAL
## RIGHTS TERMINATION

The hearing to terminate the mother's parental rights occurred on February 13, 1991.

Anonymous reports regarding abuse of Lloyd and Gena brought the children to the attention of the Department of Social Services (DSS) and resulted in the mother's voluntarily working with DSS concerning her children's well-being. Within a few weeks after Christy's birth, the child was hospitalized because "she was failing to gain weight and was, in fact, losing weight." An attending physician suspected that Christy was not getting enough food and conveyed his suspicions to authorities, who placed Christy in a foster home on December 29, 1986. Although the juvenile court, on January 7, 1987, adjudged that Christy was a child within the court's jurisdiction, based on Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) (lack of proper child care as the result of parental fault or habit; parental neglect or refusal to provide necessary subsistence or care necessary for a child's health, morals, and well-being), Christy was returned to her mother on January 14. However, on January 22, DSS personnel learned about the three children in their mother's home, where Christy was suffering from "pinkeye" and Lloyd, then 3 years old, and Gena, nearly 2, were locked in a bedroom. Police removed the hungry and dirty children from the home. On February 18, the court adjudicated that Lloyd and Gena were children within the purview of Nebraska's Juvenile Code, pursuant to § 43-247(3)(a).

On March 4, the court ordered a rehabilitation plan to facilitate reunion of the children with their mother. The plan required that the mother abstain from consumption of alcohol and use of drugs, participate in counseling and therapy sessions, and attend classes in parenting. However, soon after issuance of the plan, the mother broke her arm by hitting a car window during a drunken brawl, was absent from numerous counseling sessions, and skipped four of six scheduled parenting classes. On August 28, the court ordered a second

plan substantially similar to the previous plan, but the mother failed to comply with the second plan. The mother moved from place to place without telling DSS about her location. In fact, between February 1987 and August 1990, the mother lived at more than 30 different addresses while in 13 different cities in 6 different states, with Cloquet, Minnesota, as her most recent address just before the termination hearing. The mother missed several of the periodic 6-month review hearings to assess the mother's rehabilitation under the court-ordered plan. Although ordered to pay $25 per child each month as child support, the mother paid no child support until the termination petitions were filed in January 1991. At the time of the hearing, the mother was working full time as a nurse's aide and had recently commenced attendance at parenting classes and counseling sessions, after apparently terminating her common-law marriage, which began in 1989. On the mother's return to Nebraska, and even shortly before the termination hearing, Gena and Christy did not recognize their mother. When Lloyd finally recognized his mother, he experienced great confusion and her return coincided with a resurgence of a severe behavioral problem in Lloyd.

The mother testified that her absence from review hearings was occasioned by her difficulties with finances and transportation. The longest period of the mother's employment was "[m]aybe . . . a week." Her successive and widespread residences and her noncompliance with the rehabilitation plan were the result of the mother's protracted unemployment and her searching with her former common-law husband to find that man's children. When those children were eventually found, she served as a "main caretaker" for the children until her return to Nebraska in December 1990. The mother acknowledged that on her return to Nebraska, she had intended to stay in the state for just a few weeks and then return to Minnesota. However, when the petitions to terminate her parental rights were filed in January 1991, she decided to remain in Nebraska.

At the termination hearing, the mother introduced into evidence two reports from her psychotherapist in Minnesota. The first report, dated April 3, 1990, states:

[The mother] has been living with her current boyfriend for approximately 1 year and, though they're not legally married, she has adopted his last name as her own. She revealed that this relationship is near termination and that her boyfriend is going to get back with his former spouse and his 2 children who are frequent visitors in their household. Client also admitted that she frequently uses manipulation as a ploy to make her boyfriend commit to a relationship with her and when she feels that he is abandoning her, resorts to extreme anger.

. . . .

[The mother's personality profile] suggests an individual who often presents themselves [sic] in an unrealistically favorable way. This person may have difficulty with anger control and at times display exaggerated anger responses without any apparent provocation. Individuals with similar profiles typically resent authority and often have a history of conflict with society. In addition, individuals with similar profiles are often referred by social agencies for evaluation, but they have difficulty in seeing any problems in themselves. They are not likely to attend regularly or participate in therapy. In addition, this profile suggests an individual who may have a tendency towards addictive behaviors.

Client was also administered the Substance Use Disorders Diagnostic Schedule (SUDDS) and an Alcohol Use Profile. Although client was cooperative throughout assessement [sic], it was noted that her response style was predominately one directional to deny her use of alcohol and/or drugs. This suggested that she was presenting herself in the best possible light. Although there were some contradictions noted in the information she presented, the assessment was not indicative of dependence nor abuse.

In the second report, dated December 3, 1990, the psychotherapist stated that

[the mother's] attendance in therapy continues to be somewhat sporadic since the initial progress report and she has failed to show for several scheduled appointments. [The mother] remains somewhat resistant in her

participation and has stated that she has difficulty understanding why she should be involved. She continues to exhibit problems with her anger control which has been exhibited in ongoing physical altercations with her boyfriend.

When the mother's lawyer tried to inquire about the number of rehabilitation plans ordered for the children's father, the court, responding to a relevancy objection, excluded testimony about rehabilitation plans for the children's father.

### JUDICIAL NOTICE AT
### TERMINATION HEARING

In the termination hearing, the State requested that the court "take judicial notice of the testimony [and] exhibits, received as evidence in all adjudication, dispositional and evaluation hearings in Cases Number 2456 and Cases Number 2476" pertaining to the three children involved in the present appeals. A transcript of the prior proceedings, including testimony and exhibits offered or received, apparently had not been prepared and, therefore, was not presented in conjunction with the State's request for judicial notice. The mother's lawyer objected "strongly to the taking of straight judicial notice in this particular proceeding" and argued that the mother

> would like the opportunity to specifically object to any evidence and statements made, and I believe it's the State's burden to show in this formal hearing that she has failed in her parental obligations, and the hearsay statements and relaxed rules [of evidence] that apply to prior hearings should not be applied to such an important hearing as today.
>
> . . . .
>
> . . . [T]o preserve a right for appeal, we are required to specifically note each and every objection. Without a transcript of those particular statements and testimony presented at prior hearings, we will not be able to preserve that for appeal.

The State responded: "[I]t is appropriate for the Court to receive under judicial notice all those past proceedings. This Court has heard those before. It is redundant, I think, to

anticipate this Court hasn't heard them because it has. It knows those facts. It knows those hearings." The judge who presided at the termination hearing also presided at the previous proceedings involving the mother's children.

In ruling on the request for judicial notice, the court did not identify any adjudicative fact judicially noticed, but stated, "The Court will take judicial notice of Cases 2456 and 2476 of all pleadings, adjudications and records that are admissible."

The subject of the juvenile court's judicial notice, when eventually reflected by a transcript containing the testimony and exhibits now contained in the bill of exceptions, but which was unavailable and, therefore, not presented when the court took its judicial notice, includes hearings which occurred throughout a span exceeding 4 years, starting with the detention hearing for Christy on December 29, 1986, and including Christy's adjudication hearing on January 7, 1987, the adjudication hearing for Gena and Lloyd on February 18, 1987, and 13 subsequent hearings before the termination hearing on February 13, 1991. At those hearings before the trial for termination of parental rights, 33 witnesses testified and 36 exhibits were presented to the court. Transcription of testimony in the proceedings before the termination hearing covers 490 pages in 4 volumes of transcription. The material judicially noticed is 70 percent of what is now contained in the bill of exceptions presented for review in this court.

## JUDGMENT IN THE JUVENILE COURT

At the conclusion of the termination hearing, the court determined that the evidence clearly and convincingly established that the mother "has abandoned the children for a period of time in excess of six (6) months immediately prior to the filing of the Petition to Terminate Parental Rights. The mother has substantially, continually and repeatedly neglected the children, refusing to give the children necessary parental care and protection" and that the children's best interests require termination of their mother's parental rights.

## ASSIGNMENTS OF ERROR

The mother claims that error has occurred by the trial court's (1) taking judicial notice of all prior proceedings involving the

mother's children, (2) excluding evidence regarding the number of rehabilitation plans ordered for the children's father, (3) allowing the guardian ad litem to control visitation of the children, (4) determining that evidence clearly and convincingly established the mother's abandonment and neglect of her children, and (5) deciding that termination of the mother's parental rights was in the children's best interests.

## JUDICIAL NOTICE IN
## THE JUVENILE COURT

Recently, in *In re Interest of C. W. et al.*, 239 Neb. 817, 823, 479 N.W.2d 105, 111 (1992), this court stated:

> While we recognize the Nebraska Evidence Rules are not applicable in a dispositional hearing, including a hearing to terminate parental rights, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated.

Although the Nebraska Evidence Rules may be inapplicable to the termination hearing we are reviewing, nonetheless, Neb. Evid. R. 201(2), Neb. Rev. Stat. § 27-201(2) (Reissue 1989), supplies some insight into the nature of "judicial notice," namely: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted in *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 835, 458 N.W.2d 443, 455 (1990): "[A]s a subject for judicial notice, existence of court records and certain judicial action reflected in a court's record are, in accordance with Neb. Evid. R. 201(2)(b), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." In the same vein as *Gottsch*, but expressed in this court's review of a juvenile court's termination of parental rights, the court stated in *State v. Norwood*, 203 Neb. 201, 204-05, 277 N.W.2d 709, 711 (1979): "[A juvenile court] has a right to examine its own records and take judicial

notice of its own proceedings and judgment in an interwoven and dependent controversy where the same matters have already been considered and determined."

We point out that the court in the present juvenile case did not identify what fact or facts were judicially noticed in page after page of the voluminous record eventually compiled as a part of the bill of exceptions for these appeals. Perhaps one explanation for the trial court's failure to specify the precise subject of its judicial notice is the fact which we notice: A transcription of testimony and exhibits in the prior proceedings had not been prepared and submitted for the court's consideration when the court indicated that it was judicially noticing "all pleadings, adjudications and records that are admissible" and contained in the prior proceedings involving the children. As we observed in *State v. Vejvoda*, 231 Neb. 668, 677, 438 N.W.2d 461, 468 (1989):

> Judicial notice, however, is not the same as extrajudicial or personal knowledge of a judge. "What a judge knows and what facts a judge may judicially notice are not identical data banks. . . . [A]ctual private knowledge by the judge is no sufficient ground for taking judicial notice of a fact as a basis for a finding or a final judgment . . . ." McCormick on Evidence § 329 at 922-23 (E. Cleary 3d ed. 1984).

"Care should be taken by the court to identify the fact it is noticing, and its justification for doing so." *Colonial Leasing etc. v. Logistics Control G.I.*, 762 F.2d 454, 459 (5th Cir. 1985). See, also, *Gottsch v. Bank of Stapleton, supra.* In *In Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980), the Iowa Supreme Court expressed some safeguards pertaining to judicial notice in a proceeding to terminate parental rights:

> Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling in the termination proceeding should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible.

298 N.W.2d at 278. See, also, *In re Interest of R.A.*, 226 Neb.

160, 410 N.W.2d 110 (1987).

However, for our review in the present appeals, there is no identification or indication of the adjudicative fact or facts judicially noticed by the trial court, which, basically, noticed something somewhere in the expanse of the proceedings involving the children. Without cryptesthesia or telepathy, we are unable to ascertain just what fact or facts were judicially noticed by the trial court. Moreover, the trial court remarked that it would judicially notice everything "admissible" in the prior proceedings. By using "admissible," when the Nebraska Evidence Rules are inapplicable, the trial court referred to some undisclosed standard for determination of admissibility of evidence in a hearing to terminate parental rights. Therefore, the trial court's enigmatic expression that all "admissible" parts of the prior proceedings would be judicially noticed only compounds the confusion engulfing the court's ruling on judicial notice.

On the other hand, the children's mother does not point to any deprivation of due process as a consequence of the court's judicial notice at the termination hearing, although we concede that demonstrating a deprivation of procedural due process becomes difficult, if not impossible, as a result of the uncertainty and conjecture surrounding the judicial notice taken by the trial court.

Moreover, a trial court's consideration of improper evidence does not, by itself, require reversal of a judgment terminating parental rights under the Nebraska Juvenile Code. Because factual questions concerning a judgment or order terminating parental rights are tried by an appellate court de novo on the record, impermissible or improper evidence is not considered by the appellate court. In an appeal from a judgment or order terminating parental rights, the appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

Consequently, in our de novo review of the record in the

present appeals, we disregard those items or material indicated by the trial court as the subject of its judicial notice. Thus, in light of our standard of review, we do not address the mother's first assignment of error regarding the question of judicial notice inasmuch as we conduct our review based on the record made at the termination hearing, exclusive of the material which may have been the subject of the trial court's "judicial notice."

## FATHER'S REHABILITATION PLANS

The mother was not allowed to inquire into the number of rehabilitation plans ordered for the children's father. We find no probative value in evidence regarding the number of rehabilitation plans for the children's father; hence, the mother's second assignment is without merit.

## CONTROL OF VISITATION RIGHTS

In her third assignment of error, the mother contends that the juvenile court authorized the guardian ad litem and DSS to establish and thereafter control the visitation of her children. However, in our review of the record, we find no such authorization as alleged by the mother. To the contrary, in December 1990, the court actually instructed DSS to comply with a court-ordered increase in the frequency of visitation for the mother. We find that the mother's third assignment of error has no merit.

## SUFFICIENCY OF EVIDENCE:
## ABANDONMENT AND NEGLECT

In part, § 43-292 authorizes termination of parental rights when "(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition; [and] (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection."

In *In re Interest of J.L.M. et al.*, 234 Neb. 381, 398, 451 N.W.2d 377, 388 (1990), we stated:

"Abandonment," for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love,

protection, maintenance, and the opportunity for the display of parental affection for the child. See *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988). Further, we have stated that if a parent voluntarily, but unreasonably or unjustifiably, departs from the state of residence of the parent's child or children, such departure may constitute parental abandonment of the child or children . . . . See, *In re Interest of A.G.G., supra*; *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987).

Accord *In re Interest of C.A.*, 235 Neb. 893, 457 N.W.2d 822 (1990).

From our de novo review, we find that the evidence clearly and convincingly establishes that the mother in the present case abandoned her children for a period of at least 6 months immediately before the State filed its termination petitions. See § 43-292(1). Also, we find that the evidence clearly and convincingly establishes that the mother has substantially and continuously or repeatedly neglected her children and refused to give her children necessary parental care and protection. See § 43-292(2).

The mother persistently ignored the vital interests of her young children and voluntarily, but unfortunately, left Nebraska and the lives of her children; for example, she elected to remain separated from her children in Nebraska while searching in Minnesota for her common-law husband's children. Contemporaneous with the filing of the termination petitions, the mother attempted to ameliorate a regrettable situation by staying in Nebraska, although intending to return to Minnesota; by obtaining employment; and by resuming some visitation with her children. As this court observed in *In re Interest of J.M.D.*, 233 Neb. 540, 542-43, 446 N.W.2d 233, 235 (1989):

> "The parental obligation is a positive duty which encompasses more than a financial obligation. It requires continuing interest in the child and a genuine effort to maintain communication and association with that child." *In re Adoption of Simonton*, 211 Neb. 777, 784, 320 N.W.2d 449, 454 (1982). "Abandonment is not an ambulatory thing the legal effects of which a parent may

dissipate at will by token efforts at reclaiming a discarded child." *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 241, 430 N.W.2d 552, 555 (1988).

The mother's somewhat nomadic existence left little hope for parentally produced stability in the lives of her children, and her prolonged absence from Nebraska, coupled with her unwillingness to attend to the needs of her children, as demonstrated by her rejection of parenting classes and counseling sessions, demonstrates the mother's disregard for the basic needs of her young children. At a time in the lives of the children when they most needed their mother, there was only maternal itinerancy, not interest. Consequently, we conclude that the mother's fourth assignment of error lacks merit.

## BEST INTERESTS OF THE CHILDREN

We find, by clear and convincing evidence, that the best interests of the children require termination of their mother's parental rights. By the time of the termination hearing, Lloyd had spent almost 60 percent of his life in foster care, Gena over 70 percent of her life in foster care, and Christy over 90 percent. Quite understandably, Gena and Christy did not recognize their mother. Lloyd, who is older than his sisters, did recognize his mother, but that recognition caused an adverse reaction in Lloyd and recurrence of a behavioral problem. While the mother insists that the State's action has prevented her from being an integral part of the children's lives, it is an obvious fact that it is the mother's own actions and behavior which have prevented her from being a healthy influence and factor in the lives of her children. Although the mother suggests that she has finally begun to change her life,

> prospects for the children must take into account the past conduct of a parent, not just a parental promise about the future.
>
> "When parents cannot rehabilitate themselves within a reasonable time, the best interests of a child require that a final disposition be made without delay." *In re Interest of W.*, 217 Neb. 325, 330, 348 N.W.2d 861, 865 (1984).

*In re Interest of L.O. and B.O.*, 229 Neb. 889, 896, 429 N.W.2d 388, 393 (1988).

## CONCLUSION

After our de novo review of the record, we have concluded that there is clear and convincing evidence that the mother abandoned her children for a period of at least 6 months preceding the State's filing of the termination petitions, see § 43-292(1), and that there is clear and convincing evidence that the mother has substantially and continuously or repeatedly neglected her children and refused to give them necessary parental care and protection, see § 43-292(2). Also, we conclude that there is clear and convincing evidence that termination of the mother's parental rights is in the best interests of her children.

Therefore, the judgments of the juvenile court terminating the mother's parental rights are affirmed.

AFFIRMED.

BOSLAUGH, J., dissenting in part.

While I concur in the judgment of the court in these cases, I do not agree that a juvenile court at a hearing on the motion or petition for termination of parental rights can consider evidence previously adduced in the same proceeding only if it has been "transcribed" and is presented as a document.

In *State v. Norwood*, 203 Neb. 201, 204, 277 N.W.2d 709, 711 (1979), we noted that the termination matter before the juvenile court "was a continuation of the same proceeding." And in *In re Interest of N.M. and J.M., ante* p. 690, 484 N.W.2d 77 (1992), we noted that in a case other than a juvenile case, a trial court must consider the evidence adduced from the first day of the proceeding. This same principle is applicable in juvenile cases.

The statement quoted from *In Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980), which is taken out of context, does not support a contrary view. Unlike the Nebraska Juvenile Code, the Iowa statute prescribes more than one procedure for termination of parental rights. In the *Adkins* case, Chief Justice Reynoldson reviewed and discussed parts of the record in the earlier child in need of assistance (CHINA) proceeding, which had been commenced in 1977. .

After discussing various provisions of the Iowa Code, including the provisions in chapters 232 and 600A, the *Adkins*

opinion states:

> These related statutes reveal a legislative scheme to provide for termination in the same court in which the CHINA adjudication has taken place, as a logical resolution of a child's "limbo" CHINA status where clear and convincing evidence discloses the existence of those prerequisites itemized in subsection *232.114(5)*. *In these circumstances must the evidence and proceedings in the underlying CHINA case be replayed in the same court in the termination proceeding?*
>
> It is true, of course, that ordinarily judicial notice may not be taken of court proceedings in related but wholly different cases. [Citations omitted.]
>
> However, in special circumstances exceptions to this rule have been formulated and applied. . . . In every case we have found, courts adjudicating a termination action have taken judicial notice of the underlying prior proceeding involving the subject child or children. *In re Welfare of Clausen*, 289 N.W.2d 153, 156-57 (Minn.1980); *In re Interest of Norwood*, 203 Neb. 201, 204-05, 277 N.W.2d 709, 711 (1979); *see In re Adoption of K.*, 417 S.W.2d 702, 704-05 (Mo.Ct.App.1967) (appellate court reviewing adoption proceeding judicially noticed the record filed in a prior neglect case appeal). *Although [the appellant] attempts to distinguish Clausen and Norwood because of statutory and rule differences, we are persuaded the rationale of those cases should be adopted here.* Under subsection 232.114(5), CHINA and termination proceedings are not separate and distinct actions, but are interdependent and interwoven. The CHINA action may be a prelude or first step to termination of the parent-child relationship. [Citations omitted.] Many of our decisions disclose that a termination action often follows directly from a prior CHINA adjudication. [Citations omitted.]
>
> *We hold it is permissible for a trial court in a subsection 232.114(5) termination proceeding to judicially notice the prior CHINA case, including the evidence, providing certain safeguards are followed.* Papers requested to be

noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling in the termination proceeding should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible.

(Emphasis supplied.) *Adkins*, 298 N.W.2d at 277-78.

It is not clear from the opinion in the *Adkins* case whether the judge who heard the termination proceeding was the same judge who had heard the evidence in the earlier CHINA proceeding. If the termination hearing is before a judge who has not heard the evidence presented at an earlier hearing, it would be impossible for the court to consider evidence that has been presented to a different court unless it has been transcribed and presented as a document. Ordinarily, such a problem is not presented in proceedings under the Nebraska Juvenile Code.

HASTINGS, C.J., joins in this dissent.